## MUNICH REINSURANCE CO. v. FIRST REINSURANCE CO. OF HART-FORD.

(District Court, D. Connecticut. June 2, 1924.)

### No. 1652.

**War ⬅12—Seizure of property by Alien Property Custodian divests the former owner of all title and interest.**

> Seizure by Alien Property Custodian of property of alien enemy divested the former owner of all title and interest therein. The subsequent disposition of the property or its proceeds is a matter with which he has no concern, and he cannot maintain an action in court to recover any of such property or its proceeds from a citizen of the United States to whom it has been transferred or paid, whether rightfully or erroneously.

In Equity. Suit by the Munich Reinsurance Company against the First Reinsurance Company of Hartford. On motion to dismiss bill. Granted.

Hartwell Cabell, of New York City, and Raymond E. Hackett, of Stamford, Conn., for plaintiff.

Lucius F. Robinson and Charles Welles Gross, both of Hartford, Conn., for defendant.

THOMAS, District Judge. The plaintiff, a citizen of the state of Bavaria, in the empire of Germany, brings this bill in equity against the First Reinsurance Company, a corporation chartered by the state of Connecticut and located in Hartford. In substance the bill alleges as follows:

Prior to the World War the plaintiff was engaged in the business of reinsurance in the United States. In 1912 it caused the defendant to be organized under the laws of Connecticut, with a capital stock of $500,000 and a surplus of like amount; $450,500 of the capital stock was paid for and held by the plaintiff, and the balance was owned by the directors of the defendant. On March 31, 1917, certain reinsurance contracts and retrocession agreements were in force between the parties. "The entry of the United States into the World War was imminent," as is alleged in paragraph 8, and "an arrangement was entered into between plaintiff and defendant whereby all retrocession contracts and agreements between them were canceled as of that date." The defendant thereupon continued to do business on its own account. It is further alleged that on March 15, 1918, the stock in the defendant belonging to the plaintiff was seized by the Alien Property Custodian. That stock was thereafter sold to citizens of the United States, who thereupon caused a new board of directors and a new set of officers to be chosen. After the reorganization of the defendant under American direction, it presented to the Alien Property Custodian a claim in the sum of $50,000 against the fund realized by the Alien Property Custodian from the sale of the plaintiff's stock. This sum is alleged to represent certain losses, which under the terms of the cancellation agreement of March 31, 1917, the defendant had been compelled to pay

the Home Insurance Company by reason of a certain automobile reinsurance treaty with that company. The defendant based its claim before the Alien Property Custodian solely upon the fact that one Carl Schreiner "had represented both companies"—i. e., plaintiff and defendant—"in consummating the agreement between them whereby the retrocession of the automobile business by the defendant to the plaintiff had been terminated as of March 31, 1917, and whereby, after said date, all premiums paid with respect of said business to the defendant were to be retained by it and all losses sustained thereunder paid by it." Paragraph 11. On October 20, 1922, the Alien Property ·Custodian allowed and paid the claims out of the aforesaid fund.

The plaintiff then pleads argumentatively as follows:

"(13) The plaintiff avers and respectfully represents to the court that, if the circumstances hereinabove alleged entitled the defendant to rescind the said arrangement of March 31, 1917, whereby all retrocession agreements and contracts between the two companies were terminated, the legal effect of the making of said claim by the defendant, and the repayment of the said losses by the Alien Property Custodian as to the defendant and the receipt thereof by it was a rescission of the said arrangement between the two companies whereby all retrocession agreements and contracts between them were terminated as of March 31, 1917, and that as a result of such election to rescind and such rescission by the defendant this plaintiff is entitled to treat said arrangement as void ab initio and to consider all retrocession agreements and contracts then and theretofore existing between it and the defendant and not otherwise terminated as continuing and now being in full force and effect; that, on the contrary, if there existed no right in the defendant to rescind the said arrangement of March 31, 1917, and said arrangement has not been rescinded, the defendant was not entitled either in law or in equity to said payment, and holds said money so wrongfully received by it as trustee for the plaintiff, and is accountable to the plaintiff for the same."

The plaintiff concludes with a prayer for alternative relief; i. e., for an accounting or for the repayment to it of the $50,000.

To this bill the defendant interposes a motion to dismiss and an answer. Various grounds are advanced in support of the motion, but in its ultimate bearing and effect the motion is predicated upon the alleged failure of the bill to set forth a cause of action. Of the numerous interesting and important problems developed by the pleadings, it strikes me that the pith and essence of all of them may be postulated thus:

"May a former enemy sue to recover from a citizen of the United States enemy property theretofore seized by the Alien Property Custodian by virtue of the powers vested to him by law, and thereupon paid or transferred by the Alien Property Custodian to said citizen? Can such a suit be maintained on any theory?"

It is perfectly obvious that, if the correct answer to this question is in the negative, the motion to dismiss will have to be granted, but, if the answer be in the affirmative, the motion will have to be denied. In our attempt to reach a solution of this problem we first encounter the statute under which the Alien Property Custodian functioned. His powers were defined by the Trading with the Enemy Act (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½a et seq.). That act, inter alia, created the office of the Alien Property Custodian and defined

its powers and attributes. Whether it also defined and established the status of such property remains to be determined.

It is the contention of the defendant that the seizure by the Alien Property Custodian of the stock belonging to the plaintiff under the authority of the acts of Congress and the executive orders made thereunder, vested in that official an absolute title in such property, in trust, for the people of the United States, and that upon the consummation of such seizure all right, title, and interest of the plaintiff in said property ceased. And as a corollary of that proposition it is further urged that this escheat of interest renders impotent any attempt by the former enemy owner to reach such property or its proceeds through judicial channels. The plaintiff insists that such seizure did not eliminate all its interest in the seized property; that said trust was for the benefit of itself as well as for the benefit of the United States; that the seized property, while it remained in the sovereign custody, was impregnable to the attack of the plaintiff, as long as such possession and control continued; but that such property was no longer immune from the claim or right of the plaintiff, once that possession or control was voluntarily-surrendered.

It is indeed a somewhat perplexing circumstance that nowhere in the entire act is there an explicit or definitive demarcation of the status of the property seized by the Alien Property Custodian. Where such vast issues were involved, it would seem as if the legislative will would seek most meticulously to eliminate all opportunities for equivocation. Whether of deliberate intent or of inadvertence, the fact remains that in set terms there is no pronouncement on the matter of title. We must nevertheless deal with the facts as they exist and seek to determine the legislative will from the memorials at hand.

The original act of 1917 provided that the Alien Property Custodian take over the property seized from enemy aliens. It provided that all moneys received by the Alien Property Custodian were to be turned over at once to the Treasurer of the United States, to be invested and reinvested by the latter, and that all property of an enemy or an ally of an enemy, conveyed, transferred, assigned, or delivered to the Alien Property Custodian, should be safely held and administered by him. The act in express language vested in the Custodian all the powers of a common-law trustee in respect of the property seized. The Custodian was also required to forthwith deposit with the Treasurer of the United States the proceeds of any property or rights sold by him. The act then provided (section 12 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff]) that:

"After the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct," etc.

Now it would seem that these powers of management and disposition of money or other property, of necessity, invested the Alien Property Custodian with the complete ownership, in trust, of the property seized by him. Nor can there be much doubt as to who the cestui que trust was intended to be. The Alien Property Custodian was an official

exercising the executive prerogative. The object of the seizure authorized by Congress was not to aid or assist the enemy or to conserve his property. The trust devolved on the Custodian was obviously for the benefit of the people of the United States; it could have been for none other. But for one provision in the act, the conclusion would be irresistible that, while Congress did not expressly declare a confiscation of enemy owned property upon the seizure thereof by the Alien Property Custodian, defeasable at the future will of a future Congress, such, nevertheless was its purpose.

The provision referred to concerns the payment of claims of third parties. It was provided in the act that the President was empowered with the *assent of the owner of the property* to convey, pay, assign, and transfer seized property, or part thereof, to third party claimants and incumbrancers. The use of the word "owner," as indicating the relation of the enemy alien to the seized property, would seem to negative the idea that the act, as originally drawn, was intended to effect a confiscation of seized enemy property. It was not merely the use of the word which was significant; it was the recognition of the right to veto the transfer that was pregnant with an admission of a substantial, if undefined, interest in the enemy. Just how such recognition of interest was compatible with the free exercise of the power and jurisdiction devolved upon the Alien Property Custodian is a question upon which much casuistry might be expended. It may be fairly questioned whether the legislative will did in fact here present a consistent aspect, and whether the scheme of proposed treatment of enemy-owned property was logically coherent. We are, however, spared the necessity of entering into these inquiries, because the act was amended, and, as we shall show, whatever blurring of purpose or intent there may have been in the statute as first enacted, rectification ensued when the amendments were passed.

The first step undertaken looking toward clarification was by the amendment of March 28, 1918, section 1 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115½ff) of which provided that, in addition to the powers of a common-law trustee theretofore vested in the Alien Property Custodian, he was to have—

"power to manage such property and do any act or things in respect thereof or make any disposition thereof or of any part thereof, by sale or otherwise, and exercise any rights or powers which may be or become appurtenant thereto or to the ownership thereof in like manner as though he were the absolute owner thereof."

The inquiry naturally follows: What possible residue or right, title, or interest in the seized property could have been reserved to the enemy, where the Custodian was vested, not only with the legal title as trustee, but could, by sale or otherwise, exercise any rights or powers in connection therewith in like manner as though he were the absolute owner thereof?

The second step was taken, if it were at all necessary, when Congress by the Act of July 11, 1919 (41 Stat. 35), eliminated the provision which required the assent of the "owner" of the property in order to validate a disposition thereof to third party claimants. The plenary power reposed in the President and his Custodian was then unshackled of this

incongruous limitation, which could serve only to obscure the legislative will, and to hamper and possibly paralyze its effectuation.

It would be futile to contend that the act did not vest in the Alien Property Custodian power to convey an absolute title to seized property. Of necessity a transferee of the Custodian would take such property free from any claim or lien thereon in favor of the former enemy owners. The Custodian had an absolute title to give. It must be, then, that his seizure foreclosed all interest of the enemy. Did any interest survive which might attach to the funds realized by him out of the sale of this seized property? While the answer must be in the negative, the contentions made by plaintiff, if they are to be sustained, demand an answer in the affirmative.

When the Alien Property Custodian sold the stock of the plaintiff and realized certain moneys therefrom, to whom did these moneys belong? The act provided for their ultimate deposit with the Treasurer of the United States. Prima facie, then, they were moneys belonging to the United States. That the United States was willing to and did permit third parties, who had claims against the enemy, to prove these claims before the Alien Property Custodian, or in court, and to procure satisfaction of the same out of these moneys, in no wise abridged or conditioned the full title vested in the United States. Nor can it be said, as I view it, that because Congress, in its provision, saw fit to render the ownership of seized property by the United States flexible to the exigencies which might emerge with the termination of the war, by reserving a freedom of disposition with reference thereto, therefore the title of the United States in such property was incomplete or conditioned.

If the funds realized on the sale of enemy owned property were the property of the United States, it is obvious that the disposition of these funds by the United States could in no way be the legal concern of the enemy from whose property such funds originated. The Alien Property Custodian may have erroneously disbursed these sums, but for such error or possible malfeasance he would be answerable to the United States and not to the enemy. If instead of paying $50,000 to the defendant herein upon a claim made by the defendant in good faith, the Custodian had deliberately given these moneys away to a stranger, it would have been the property of the United States which he had converted or embezzled, and not the property of the enemy.

The plaintiff would urge that the funds realized by the Alien Property Custodian from the sale of the stock constituted a substitution of the res, and that, while the interest of the plaintiff in the stock ceased by such transfer and conveyance, it automatically reattached to the funds realized, and that thereafter, if the funds passed out of the possession of the Custodian of the United States, the full property right therein revested in the plaintiff. But such a contention runs counter to the spirit of the act. It would be equally operative to destroy a claim of title made by purchasers from the Alien Property Custodian. If the release and transfer of the funds realized from the sale of stock constituted an erasure, as it were, of the title and interest of the United States in the same, instead of a conveyance thereof, so as to permit the

fund to be followed in the hands of the person to whom it came, then it is difficult to see why the same principle would not operate to permit the plaintiff to attack the ownership of the stock itself.

The sale of the stock and the transfer of the $50,000 were both of them acts of administration performed by the Alien Property Custodian in the execution of his trust. In one case the property formerly owned by the enemy alien was transferred. In the other, the proceeds of such property were transferred. In both cases the property had been in the possession of the Custodian, and no longer was in such possession. What is the logic which would permit a former enemy to follow the funds, but would prohibit him from following the very property which had been his? The contention of the plaintiff is strained and cuts too deeply. It cannot be sustained, unless we are to hold that Congress intended nothing but a bare custodianship to be vested in the Alien Property Custodian. Nor can it be sustained in the face of the authoritative utterance of the Supreme Court. In Commercial Trust Co. v. Miller, 262 U. S. 51, at page 56 (43 Sup. Ct. 486, 488, 67 L. Ed. 858) Mr. Justice McKenna, speaking for the court, said that under the act—

"the Custodian succeeds to all the rights in the property to which the enemy is entitled as completely as if by conveyance, transfer or assignment."

If, then, the plaintiff had no right, title, or interest in the moneys paid by the Alien Property Custodian to the defendant herein, it is not necessary to determine whether or not such payment is right or in justice, should have been made. Equally unimportant is it to determine whether in any event the plaintiff may thus impeach the finality of the acts or administration of the Alien Property Custodian. It is sufficient for the purposes of this motion that the plaintiff clearly has no interest in the fund sought to be recovered in this action.

But there is an alternative demand for relief in the bill. That demand is for an accounting of the moneys and profits made by the defendant subsequent to March 31, 1917, and upon the ground that the cancellation agreement, by the act of the defendant in making its claim before the Alien Property Custodian, was rescinded and canceled, and thus the contractual relations of the parties existing prior to March 31, 1917, were revived and continued.

While the motion to dismiss is in the nature of a demurrer, and therefore admits all allegations of fact pleaded in the bill, nevertheless I cannot but deem the allegation respecting the rescission, upon these facts, as stating a conclusion of law. I find nothing in the fact that the defendant made a claim for reimbursement of certain losses to the Alien Property Custodian as constituting a rescission of the cancellation agreement of March 31st. Nor, even if such rescission had been attempted and effected, can we find that there was any possible legal continuance of commercial and business relations between the plaintiff and the defendant subsequent to the declaration of war which took place six days later. If the cancellation agreement of March 31 had never been entered into, April 6, 1917, would nevertheless have marked the date when all agreements between the parties ceased.

It follows, therefore, that the motion to dismiss the bill must be granted; and it is so ordered.