[S. F. No. 12560. In Bank.—April 30, 1931.]

J. C. ISENBERG et al., Appellants, v. GEORGE SHER-
MAN et al., Respondents.

456

John Francis Neylan, Sullivan, Sullivan & Roche, and Bartley C. Crum, for Appellants.

458

Oscar Sutro, Pillsbury, Madison & Sutro, W. H. Lawrence, Alfred Sutro and Eugene M. Prince for Respondents.

THE COURT.—This appeal is prosecuted by the complainants from a judgment in favor of respondents, made and entered by the trial court in an action tried before the court without a jury.

The complainants, seventeen in number, are stockholders, ex-stockholders, or represent existing or former stockholders of H. Hackfeld & Company, Limited, an Hawaiian corporation. That corporation, during the period involved herein, had its principal place of business in Honolulu, and was engaged in the sugar factor and merchandising business.

The complaint is in equity, and is headed "Complaint for Accounting, Relief against Fraud and Conspiracy, for Damages and Incidental Relief". The purport of the complaint is to require the individual and corporate respondents to account to complainants for all matters and things concerning the transfer and sale of the assets of H. Hackfeld & Company, Limited, to American Factors, Limited, an Hawaiian corporation, organized for the express purpose of taking over the business and assets of said H. Hackfeld & Company, Limited. The gist of the complaint affirms the sale and alleges that the sale and transfer were the result of conspiracy, collusion and fraudulent connivance on the part of certain of the respondents, whereby they secured the assets and profitable business of H. Hackfeld & Company, Limited, at a price far below its alleged intrinsic value, in fraud of and to the financial injury of complainants. The object of the suit is to require respondents to account to complainants for the transfer and sale of the assets of H. Hackfeld & Company, Limited, to American Factors, Limited, and to account for the difference between $7,500,000, the price at which the assets were sold, and the actual value of the assets of the corporation at the date of transfer, which appellants claim to be $17,500,000. The Alien Property Custodian of the United States was made a respondent, but no relief or judgment is sought against him, it being alleged that his interest as trustee for certain of the stockholders "is identical with the interest of the complainants herein", but not having joined as a complainant, he is joined as a respondent, "so that, as such

trustee, he may properly receive the benefits of any judgment which may be entered herein''. Certain other persons are made formal respondents for the same reasons.

The main theory upon which the complaint proceeds is that the Alien Property Custodian, by virtue of certain seizures of enemy owned stock, became a stockholder in H. Hackfeld & Company, Limited, and, it is alleged, certain of the respondents, while acting as trustees for all of the stockholders, concealed from the Alien Property Custodian, and from the other stockholders, certain material facts as to the real value of H. Hackfeld & Company, Limited, and, by a fraudulent conspiracy, controlled his vote as stockholder, and, by force, undue influence, coercion, fraud and concealment, induced the other stockholders, including the complainants, to vote for the sale of the assets of H. Hackfeld & Company, Limited, to American Factors, Limited, for a grossly inadequate price.

On this appeal appellants contend that the action is one brought by stockholders on behalf of a defrauded corporation, and that it is not an action brought by appellants as individuals. This issue would be of some importance in the event of a reversal, for the reason that the trial court found that certain of the complainants were estopped from maintaining the action. However, in view of the conclusions hereinafter set forth, we do not deem it necessary to decide this question.

In addition to the filing of this complaint the appellants have likewise filed a similar complaint in the Circuit Court for the First Judicial Circuit of Hawaii. In the same court in Hawaii there is likewise pending the final account of the Trent Trust Company, Limited, respondent herein, as trustee in liquidation of H. Hackfeld & Company, Limited. The complainants in the present action (appellants herein) have filed in Hawaii an answer and objections to this account. By stipulation it was agreed in substance that the present action was to be tried before the Honorable Frank J. Murasky, Judge of the Superior Court of the City and County of San Francisco, and it was likewise agreed that all of the issues in the present action and all of the issues raised in the two Hawaiian actions should be tried and determined in the Superior Court of the City and County of San Francisco. It was further stipulated that

the existence of proceedings in either jurisdiction should not be pleaded as a bar to or in abatement of the proceedings in the other jurisdiction.

The answer of respondents denies all of the material allegations of fraud and conspiracy found in the complaint, and further alleges ten special and affirmative defenses. These defenses briefly were (1) that all appellants are estopped because they or their representatives unanimously voted for and approved the sale complained of; (2) that all appellants are barred by laches; (3) that all acts done by respondents were done under the authority of the Trading with the Enemy Act; (4) that the Treaty of Versailles bars those appellants who are German nationals; (5) that the action is barred by the Hawaiian statute of limitations; (6) that certain appellants are barred by virtue of written releases executed by them; (7) that the acts of the Alien Property Custodian are not subject to judicial examination or review; (8) same defense as to Trent Trust Company, Limited, in so far as it acted as the depositary and agent of the Alien Property Custodian; (9) same defense as to certain of the respondents who were appointed or elected pursuant to nomination of the Alien Property Custodian as officers, directors or trustees of H. Hackfeld & Company, Limited; (10) that the sale of the assets of H. Hackfeld & Company, Limited, was made in good faith at the request of the Alien Property Custodian in the public interest, and that all acts of which complaint is made were done and authorized by the provisions of the Trading with the Enemy Act.

As mentioned above, the Alien Property Custodian of the United States was made a formal respondent. At the time the trial commenced he had not appeared or answered the allegations of the complaint. After considerable oral and documentary evidence had been introduced, the then Alien Property Custodian, Frederick C. Hicks, through the United States attorney's office, appeared and filed an answer. He denied all of the allegations of fraud and conspiracy on the part of the Alien Property Custodian; alleged the stock had been seized as enemy owned, under the provisions of the Trading with the Enemy Act; specifically accepted the evidence and proceedings so far had as fully as though he had appeared and answered before the

beginning of the trial, and asked for judgment against respondents for whatever sum the court may deem them liable. He did not directly affirm or deny the allegations of fraud in reference to the other respondents.

At the conclusion of the trial, and after some 112 days had been consumed in the taking of evidence, the trial judge filed the following terse memorandum:

"I am of the opinion that (1) no actual fraud on the part of respondents was shown; (2) no constructive fraud existed; (3) the price paid was adequate; (4) the suit is not barred by the Hawaiian statute of limitations; (5) plaintiffs were not guilty of laches.

"FRANK J. MURASKY, Judge."

Findings of fact were prepared by counsel and approved by the court and judgment entered January 31, 1927. In due course appellants moved for a new trial, and, upon denial of the motion, have prosecuted this appeal by the alternative method from the whole of said judgment and from the order denying a new trial.

Appellants in their opening briefs took the position that since the addition of section 956a to the Code of Civil Procedure, in 1927, this court could pass upon the weight of the evidence and, in a proper case, make new findings, contrary to the findings of the trial court, in reversing a case. The position of appellants in this regard is unsound. In the case of *Tupman* v. *Haberkern*, 208 Cal. 256 [280 Pac. 970], it was specifically held that the rule that this court is bound by the findings of the trial court based upon substantial evidence was in no way changed by the addition of section 956a to the Code of Civil Procedure. This position was reaffirmed by this court in *Davis* v. *Chipman*, 210 Cal. 609 [293 Pac. 40].

If the findings are supported by the evidence, and the findings support the judgment, nothing remains to be done except to affirm the judgment. This rule, many times enunciated by this court, was in no way changed by the 1927 admendment.

In addition to the argument in reference to the weight of the evidence, the appellants attack 11 of the 56 findings of the trial court as having no support in the evidence.

After the opening brief of appellants had been filed and respondents had replied thereto, appellants, by permis-

sion of this court, filed a "Supplemental Opening Brief". In this brief the appellants contend that the stock in H. Hackfeld & Company, Limited, was never validly seized by the Alien Property Custodian, and was therefore illegally voted by him at the time the assets of the corporation were sold to American Factors, Limited. Respondents replied to this brief, and, in addition to answering the point on its merits, contend that the issue of the validity of the seizures is not properly before this court, for the reason that it was neither pleaded nor urged before the trial court, and that appellants are thus seeking to raise a new point and present a new theory on appeal. For reasons that will later appear, we have determined to decide this point on its merits.

A brief summary of the facts of this case, as disclosed by the findings and amply supported by the evidence, is as follows.

Prior to the World War the sugar industry of the Hawaiian Islands was practically eighty-eight per cent controlled by five factor and agency corporations. These corporations were Theo. Davis and Company, Limited, a concern British controlled, not a party to this proceeding; respondent C. Brewer & Company, Limited; respondent Castle & Cooke, Limited; respondent Alexander and Baldwin, Limited, and H. Hackfeld & Company, Limited. The three respondent corporations were controlled by American citizens. H. Hackfeld & Company, Limited, was looked upon as a German concern, it being controlled by German nationals or by Americans of German birth or name. It is in this corporation that appellants herein were stockholders at the time the transactions here complained of took place.

H. Hackfeld & Company, Limited, was an Hawaiian corporation, capitalized for $4,000,000, represented by 40,000 shares of stock of the par value of $100, of which 37,000 shares were common stock and 3,000 shares preferred to the extent of ten per cent. When war ,was declared by the United States against Germany in 1917 appellant J. F. Hackfeld, president of the corporation, was living in Germany; appellant George Rodiek was senior vice-president and general manager; appellant John F. Humburg was second vice-president and manager of

the San Francisco office; J. F. C. Hagens a formal respondent, with interests identical with appellants, was third vice-president and assistant to Mr. Rodiek in Honolulu; appellants August Humburg, F. W. Klebahn, Herman P. F. Schultze and B. von Damn were departmental managers in Honolulu, and all but von Damn were directors of the corporation; appellant J. C. Isenberg, a director, was in Germany. In addition, all were stockholders in varying amounts. It was found by the trial court, and appellants virtually admit, that at time the Trading with the Enemy Act was passed, in October of 1917, 14,724 shares of the capital stock of H. Hackfeld & Company, Limited, were owned by "enemies", as defined by that act, and that, as such, all 14,724 shares were subject to seizure by the Alien Property Custodian of the United States, who was then J. Mitchell Palmer.

In addition to the above enemy interest in the firm, another corporation, enemy controlled, held 12,647 shares of the capital stock of H. Hackfeld & Company, Limited. This corporation, organized under the laws of Hawaii, was J. F. Hackfeld, Limited, a holding company, organized by appellant J. F. Hackfeld for the purpose of administering his private fortune. This holding company had a capital stock of 5,000 shares, of which appellant J. F. Hackfeld held 4,969; appellants Julie Randolphi and Marie Feine, daughters of J. F. Hackfeld, and then living in Germany with him, held 10 shares each; appellant George Rodiek held 10 shares, and J. F. C. Hagens held 1 share. Thus ninty-nine per cent of the stock of this company was subject to seizure by the Alien Property Custodian as enemy owned. Mr. Hagens was the only director of this corporation in Hawaii during 1917 and 1918.

From the above facts it is clear that the majority of the stock in H. Hackfeld & Company, Limited, was enemy owned or controlled. It is obvious also that if the interests in the two corporations should be seized by the Alien Property Custodian, he would, by virtue of such seizures, control H. Hackfeld & Company, Limited, in so far as a majority stockholder can control a corporation. He would hold 14,724 shares directly, and by virtue of the fact that he would hold ninety-nine per cent of the stock of J. F. Hackfeld, Limited, he would control the 12,647 shares of H. Hackfeld & Company, Limited, stock held by that

company. He would thus, directly or indirectly, control 27,371 shares out of 40,000 shares, or about sixty-eight per cent of the stock in H. Hackfeld & Company, Limited. As will later appear this is just what did occur.

In 1917 H. Hackfeld & Company, Limited, was one of the largest and most important of the five sugar factor companies mentioned above. In addition, it conducted a very large merchandising business and held various agencies of steamship lines and insurance companies. It was the agent of nine large and important sugar plantations in the islands, to which it rendered various services. It made money advances, sold the principal's sugar on commission, furnished supplies under its agency contracts, on which commissions were charged, and acted as banker and adviser to the plantations which it served. The corporation, as did the other sugar factor companies, owned large blocks of stock in the various plantations whose agency contracts it held, and from which it derived a substantial part of its earnings. Moreover, several of the stockholders of H. Hackfeld & Company, Limited, as individuals, held large blocks of stock in the plantations whose agency contracts the corporation held. The vote and influence thus secured was the main assurance of the stability of the agency relations. Through its various agency contracts the corporation controlled, in 1917, about twenty per cent of the sugar produced in the islands. The four other major sugar factor companies, above named, three of whom are respondents herein, operated under practically the same conditions as did H. Hackfeld & Company, Limited, rendering the same type of services to their client plantations, but were not engaged in the merchandising business.

A circumstance stressed somewhat in this case is the fact that incorporated family estates played a very important part in the five factor companies. As already pointed out, J. F. Hackfeld, Limited, held approximately thirty per cent of the stock of H. Hackfeld & Company, Limited. J. B. Atherton Estate, Limited, respondent herein, held thirty-five per cent of the stock of Castle & Cooke, Limited; Henry P. Baldwin, Limited, and respondent Alexander Properties Company owned, respectively, twenty-one per cent and six per cent of Alexander & Baldwin, Limited,

and respondent Charles M. Cooke, Limited, owned about one-sixth of the stock of C. Brewer & Company, Limited.

Immediately after United States declared war on Germany, H. Hackfeld & Company, Limited, found itself seriously embarrassed. The majority of its stock was enemy owned or controlled. In the public eye the corporation was fixed as a German concern, with German sympathies. Its chief executive had been German consul; the German consulate in Hawaii was housed in the Hackfeld Building; the imperial device was conspicuously displayed on the front of the building; a large portion of its stockholders had German names; a considerable number of its clients were Germans; its acting president, George Rodiek, in 1917, had been German consul, and early in that year had been indicted in San Francisco for breach of the neutrality laws in connection with the so-called "Hindu Plot", and had pleaded guilty and been fined $10,000; and his consular secretary, an employee of H. Hackfeld & Company, Limited, was likewise indicted, pleaded guilty, and was fined $1,000. These facts are not recounted with any intent to imply that anyone connected with H. Hackfeld & Company, Limited, was disloyal to United States after war was declared. The record does not even intimate that such was the fact, and the trial court found, and all are agreed, that every person connected with the company and living in America during the war acted honorably and loyally. But the fact does exist that, because of the above facts, the corporation became increasingly embarrassed and hampered in its business relations. The United States government was suspicious of the corporation and the public was distrustful. The corporation was on the "black list" of Great Britain; the use of cable and radio was denied it; its steamship and some of its insurance agencies were canceled; other business connections were severed, the importation of certain necessary supplies was stopped. In the public press during this period appeared various articles under the name of "Dixie Doolittle", attacking the Americanism of certain of the officers of H. Hackfeld & Company, Limited. It was proved at the trial that the author of these articles was Richard H. Trent, president of the Trent Trust Company, Limited, both respondents herein. Appellants make much of the fact, alleging it

was the first step in the conspiracy to force the sale of the assets of H. Hackfeld & Company, Limited, to the other sugar factor companies at an inadequate price, but the trial court found otherwise, and this finding is amply supported by the record. Certainly there was no evidence tending to connect Trent with any of the other respondents in reference to these articles.

Such was the situation late in 1917. The prospect, was certainly ominous, particularly with the prospect, since the passage of the Trading with the Enemy Act, in October of 1917, of having a majority of the stock seized by the Alien Property Custodian.

In December of 1917 the actual management of the affairs of H. Hackfeld & Company, Limited, was in the hands of Rodiek, Hagens and John Humburg. Rodiek and Humburg were in San Francisco, and in their absence Hagens was acting manager. Hagens became so disheartened with the situation that he cabled Humburg in San Francisco that he (Hagens) must resign. Humburg hastened to Honolulu to consider with Hagens the various problems faced by the company. They came to the conclusion that the only possible solution was to reorganize and Americanize H. Hackfeld & Company, Limited. Humburg wrote to Rodiek on January 4, 1918, " . . . the facts are there plain to everyone that, if German controlled, we go to pieces, or if we Americanize, we maintain our position. . . . "

Hagens and Humburg finally worked out the following plan: They came to the conclusion that a sufficient number of shares of H. Hackfeld & Company, Limited, stock held by the holding company, J. F. Hackfeld, Limited, must be sold so that a majority of the stock would be held by Americans, and that a new board of directors must be elected. They realized that the 14,724 shares of H. Hackfeld & Company, Limited, stock directly held by enemies could not be sold by the owners thereof, but they believed that they could sell the 12,647 shares of H. Hackfeld & Company, Limited, stock held by J. F. Hackfeld, Limited, for the reason that these shares were not technically "owned" by an enemy, being owned by an American corporation, J. F. Hackfeld, Limited. Under the by-laws of J. F. Hackfeld, Limited, Hagens, as the sole director in Hawaii, was

vested with all the powers of the entire board of directors, including the power to sell the corporate property. Negotiations were opened with respondent Walter F. Dillingham and his associates for the sale to them of some of this stock. After some haggling over price it was finally agreed that Hagens, as sole resident director of J. F. Hackfeld, Limited, should sell to the Dillingham group 11,000 shares of the H. Hackfeld & Company, Limited, stock held by the holding company, at a price of $180 per share.

On January 11, 1918, the final step necessary to complete this so-called ''January reorganization'' was taken by the holding of a stockholders' meeting of H. Hackfeld & Company, Limited. George Rodiek was removed from office as vice-president and director; J. F. Hackfeld, as president and director, and J. C. Isenberg, as director, were declared disqualified by virtue of their enemy status; Schültze resigned as treasurer and director; F. W. Klebahn and August Humburg resigned as directors. A new board was elected, the enemy stock not voting, with Hagens as president and a majority of the board being selected from the Dillingham group. In order to give this group more effective control, all of the local stockholders vested control of the voting power of the stock, for the duration of the war, in five of the new board. It was the belief of the organizers that they had Americanized H. Hackfeld & Company, Limited. They had done so, in the sense that the officers and a majority of the stockholders were American citizens.

One of the Dillingham group was W. F. Frear, former Governor of Hawaii and former chief justice of the Hawaiian Supreme Court. He was sent to Washington to explain the plan to the Alien Property Custodian and, if possible, to secure his approval. The Custodian very strongly disapproved of the plan of the January reorganization, not because he did not approve the theory of the plan, but because the reorganization had proceeded without first securing his approval. He took the position that the holdings of J. F. Hackfeld, Limited, in H. Hackfeld & Company, Limited, were, in effect, enemy property. He considered that the reorganization was an encroachment upon his functions and an improper interference with the operation of the Trading with the Enemy Act. It was his opinion that approval of such plan, carried out without first securing his

consent, would set a bad precedent in reference to the many other similar cases then pending before him. Frear, Hagens and Humburg finally became convinced that it would not be prudent, politic or patriotic to withstand the desires of the government, and agreed to "unscramble" the January reorganization. As a result, the purchasers of the 11,000 shares agreed, on March 4, 1918, to retransfer the stock to J. F. Hackfeld, Limited, the final "unscrambling" being completed on March 29, 1918. Further reference to the January reorganization will be found later in this opinion.

As stated above, the Trading with the Enemy Act was passed in October, 1917. Acting pursuant to the provisions of that act, and the rules and regulations promulgated thereunder, the Alien Property Custodian had cabled to the Trent Trust Company, Limited, which telegram was received in Hawaii on January 22, 1918, appointing that company depositary for seized enemy property in the territory of Hawaii. On January 29, 1918, the Custodian, through Trent seized 14,391 shares of H. Hackfeld & Company, Limited, and 4,989 shares of J. F. Hackfeld, Limited, stock. In March of 1918, 333 more shares of H. Hackfeld & Company, Limited, stock were seized. The validity of these seizures is one of the main points of law involved on this appeal and will be discussed in detail later in this opinion. For the purposes of the present discussion it will be assumed that the seizures were valid, and it will be assumed that, by virtue of these seizures, the Alien Property Custodian became vested with the rights of a stockholder in the two Hackfeld companies.

It is at once apparent that after these seizures the Custodian was, in effect, the majority stockholder in the two companies. Directly or indirectly he was in control of 27,371 out of the 40,000 shares of H. Hackfeld & Company, Limited, stock and directly held ninety-nine per cent of the stock of J. F. Hackfeld, Limited.

Immediately after the seizures had taken place the Custodian proceeded to take charge of the affairs of J. F. Hackfeld, Limited. A special meeting of the stockholders was held on February 6, 1918, Trent voting the Custodian's ninety-nine per cent interest, and Richard Trent, Frank C. Atherton and Richard A. Cooke were elected directors. Atherton and Cooke were intimately connected with the

sugar industry. The former was vice-president, director and assistant manager of Castle & Cooke, Limited, while the latter was a director of C. Brewer & Company, Limited, and shortly became its vice-president. After the 11,000 shares mentioned above had been retransferred to J. F. Hackfeld, Limited, by orders of the Custodian, as majority stockholder, the company was ordered dissolved. This was effected on June 7, 1918, and the Trent Trust Company, Limited, was appointed trustee in liquidation.

After the January reorganization had been "unscrambled", as set forth above, Frear, Hagens and Humburg proceeded to Washington, and reached there on March 19, 1918. Up until that time the Trading with the Enemy Act did not expressly confer the power to sell seized property upon the Custodian, but there was then pending in Congress, as Frear et al. well knew, an amendment to the act, to confer this power on the Custodian. This amendment was, in fact, passed on March 28, 1918. Frear, Hagens and Humburg hoped to induce the Custodian to carry out the theory of the January reorganization by selling to the Dillingham group some of the seized stock. In the conferences that were held in Washington at this time, and in all other negotiations in reference to H. Hackfeld & Company, Limited, the Custodian was represented by Walter D. Denegre, chief of the Division in Insular Possessions, and Bradley Palmer, legal adviser to the Custodian. In these conferences, Frear, Hagens and Humburg urged time and again that $180 was a fair price for the common stock, and, in fact, Hagens offered to sell his own holdings at that price if the Custodian desired that he withdraw from the company. No agreement as to the ultimate plan of reorganization resulted from these conferences, but it was decided to call a special meeting of the stockholders of H. Hackfeld & Company, Limited, to amend the by-laws in necessary particulars, and to elect new officers and directors, who should first be approved by the Custodian as principal stockholder. It was agreed that Hagens and Humburg were to continue as managers, but not as directors. Five of the new proposed board of nine were members of the Dillingham group connected with the January reorganization, and to these the Custodian, as majority stockholder, proposed to add Trent, Atherton and Cooke, who were already directors of J. F. Hackfeld, Limited, and

George Sherman, another respondent herein, who was a retired New York banker. The Custodian was in constant cable communication with Trent, and the latter clearly called the Custodian's attention to the fact that Atherton and Richard Cooke were connected with rival sugar factor companies, but the Custodian replied that he wanted and needed them as directors because of their experience in the sugar business and standing in the islands.

The new board of directors in due time was elected with the exception that Charles Hemenway, respondent, and treasurer and director of Alexander & Baldwin, Limited, was substituted for Campbell, one of the Dillingham group, at the request of the Custodian. The election was held April 20, 1918, all of the stockholders present voting for the resolution.

The Custodian and his associates were well aware of the acuteness of the problem facing them and were also keenly aware of the necessity for speed in reference to its solution. All concerned, including Trent and the other representatives of the Custodian, wanted to preserve the business if possible, but above all they realized that Americanization of the firm was indispensable to its future prosperity. There were three possible solutions of the problem. These were:

1. The Custodian could sell the enemy owned and controlled stock along the lines of the January reorganization. Trent, as late as March, 1918, urged this plan on the Custodian, and all concerned, including at least one of the appellants, seemed agreed that $180 a share for H. Hackfeld & Company, Limited, common stock would be a fair price.

2. H. Hackfeld & Company, Limited, could be dissolved and its assets sold piecemeal. This plan the Custodian opposed, except as a last resort. It was his opinion that the keeping of the business alive was for the best interests of the corporation, its stockholders, and the welfare of the islands. It is a fact that the complete disintegration of the business of H. Hackfeld & Company, Limited, would have directly benefited the respondent sugar factor corporations, because they would naturally succeed to the agencies and other business of H. Hackfeld & Company, Limited. This the Custodian well knew. In reference to this point the trial court found in part that this plan "would have been

far more desirable to them (respondents) from a financial standpoint than was the transfer of said business to American Factors, Ltd. . . . '' This finding is reasonable and finds ample support in the record.

3. The third plan, and the one that was ultimately adopted, was outlined by Bradley Palmer in a letter and in a cable to Trent dated April 4 and April 9, 1918, respectively, and in short was, ''The corporation to sell its entire property and business as a going concern, to a new corporation to be organized under the laws of Hawaii for that purpose''.

Appellants contend that the details of this plan were formulated not by the Custodian's office but by respondent Atherton and others. The trial court found otherwise, and that finding is amply supported by the evidence. It was the plan thus suggested that was adopted, with minor changes, by the unanimous vote of the stockholders, including most of the appellants, on July 19, 1918. The basic features of this plan will be outlined later in this opinion.

In Bradley Palmer's letter and cable mentioned above, no price for the assets of H. Hackfeld & Company, Limited, had been suggested. The price of $180 per share fixed by the January reorganization would indicate a total value of $7,200,000, that sum being 40,000 times $180, which disregards the admitted lower value of the 3,000 shares of preferred stock. Bradley Palmer was called as a witness and testified that he doubted, when he wrote and cabled to Trent, if that much could be secured, and that he preferred to await a recommendation from Honolulu.

In the meantime, the Custodian had designated Messrs. Trent, Sherman, Atherton, Cooke and Hemenway as his personal ''advisers'', and they are frequently so referred to in the record. All these men were directly connected with the sugar industry, as the Custodian well knew, but in spite of this he needed them to advise him on the many problems confronting him as majority stockholder. They were men of the highest business standing and integrity, with years of experience in the sugar business. It will be remembered that all of these advisers were elected to the board of directors of H. Hackfeld & Company, Limited, at the stockholders' meeting of April 20, 1918. It was from these advisers that Bradley Palmer expected to and did

receive advice as to the value of the assets of H. Hackfeld & Company, Limited. With such relevant information as they had at hand these advisers tentatively advised that $7,500,000 would be a fair price for the assets of the company. In arriving at this tentative figure the advisers were undoubtedly strongly influenced by the price of $180 per share fixed by Hagens and Humburg in January. This figure would indicate that the total assets of the company were worth about seven million dollars ($7,000,000) if the lower value of the 3,000 shares of preferred stock is taken into consideration. The advisers studied the plan and suggested some important practical changes. These were explained to and were accepted by the Custodian. In order to secure all available information Trent employed the Audit Company of Hawaii to make a report of the current position and a summary of the business of H. Hackfeld & Company, Limited, for the past ten years. This report, after certain necessary corrections were made, showed a net valuation of over $9,000,000. Trent cabled or mailed all available information to the Custodian. The Custodian was doubtful if $7,500,000 could be realized. (That sum to be realized by a sale of 50,000 shares of American Factors, Limited, stock at $150 per share.) Trent and the other advisers were at first of the opinion that a higher price could be realized. On May 27, 1918, Trent cabled the Custodian that the advisers had tentatively fixed $8,400,000 as a fair valuation, but that they awaited further reports before making a final recommendation. On the same date the Custodian cabled Trent that he proposed to suggest that new shares be offered at $150 per share, which would bring $7,500,000 for the assets of H. Hackfeld & Company, Limited. On June 27th Trent again suggested a higher price, so that holders of Hackfeld common stock would receive $200 a share and the holders of preferred $100. This would mean that about $7,700,000 would have to be secured for the assets of the company. He likewise reported at that time that the Hackfeld business was then earning about $100,000 a month. On July 7th the Custodian gave his final opinion on value. On that day he cabled to Trent, "Think practical business considerations cannot justify price new shares over one hundred fifty dollars." In the same cable he pointed out that the business could not con-

tinue as it was then, "account opposition British and American governments, now suspended temporarily by Custodian, but Custodian cannot maintain position any longer, therefore directors and stockholders have not to decide whether to stop business already doomed but what manner to obtain best consideration for assets. . . . ". Appellants contend that the price was fixed by respondents as part of a conspiracy to secure the assets of Hackfeld & Company, Limited, at a price far below their intrinsic value. ■ Certainly the brief reference made, *supra,* to some of the correspondence amply supports the finding that the price of $150 a share for American Factors, Limited, stock was suggested by the Alien Property Custodian and not by the other respondents. It must be remembered that the Alien Property Custodian controlled sixty-eight per cent of the voting power of H. Hackfeld & Company, Limited. He was the largest stockholder. He was in control of the business of the company in a far greater sense than an ordinary majority stockholder would be. He was the official representative of the United States during war time, and consequently, his suggestions had a tremendous effect on all concerned. The Custodian's final determination was that the stockholders must accept $7,500,000 for the assets of the company, or they must sell all the assets piecemeal. The Custodian's plan was opposed by a group of stockholders consisting of Rodiek, J. F. and August Humburg, von Damn, Klebahn and Schultze, all appellants herein. It should be here clearly pointed out that these stockholders *would and did* receive more for their stock under the Custodian's plan than they would have realized at $180 a share, the price they so consistently urged on the Custodian in the attempted January reorganization. Under the Custodian's plan of $150 a share for 50,000 shares of American Factors stock, the sum of $7,500,000 would be realized by H. Hackfeld & Company, Limited, for its assets. By this plan, all stockholders in H. Hackfeld & Company, Limited, *would and did receive* about $194 a share for their common stock. These objectors were well aware that liquidation, with a piecemeal sale of the assets, would net them far less than that sum. They therefore, approved, reluctantly it is true, the Custodian's plan, rather than face this alternative.

■ It should also be pointed out at this point that *any one stockholder* could have blocked the Custodian's plan,

and all concerned knew this fact. The trial court found, and everyone concerned with this appeal concedes or admits that, under Hawaiian law, the sale of the entire assets of a solvent corporation required the unanimous consent of all the stockholders.

A special meeting of the stockholders was called for July 19, 1918. At this meeting every share of stock in H. Hackfeld & Company, Limited, was represented, with the exception of 167 shares held by Emilie C. Pflueger, who later ratified the proceedings. The directors had met on July 12th, 15th, and 17th, and drafted a resolution embodying the details of the Custodian's plan, with several changes, most of which were later ratified by the Custodian. This resolution was proposed to the stockholders on July 19, 1918, by Mr. Trent. Mr. Milverton, an attorney representing Rodiek, Schultze and Klebahn, proposed several amendments, which were adopted. Hagens seconded the resolution. The vote was unanimously affirmative, except that Milverton reserved Rodiek's vote in order to get specific instructions from him. The meeting was adjourned until July 22d, at which time Milverton, having received specific cabled authority, approved the resolution on behalf of Rodiek. All of the stockholders, directly or by their duly authorized representatives, signed a copy of the resolution, which is set forth in full as exhibit A of the answer. This resolution authorized the following plan:

1. The board of directors of H. Hackfeld & Company, Limited, were to organize an Hawaiian corporation, to be named "American Factors, Limited", with a capital stock of $5,000,000, evidenced by 50,000 shares of the par value of $100. A proposed form of articles of incorporation was appended to the resolution.

2. H. Hackfeld & Company, Limited, was to sell its entire business and assets as a going concern to the new corporation, in exchange for all of the latter's stock, the assets of H. Hackfeld & Company, Limited, to be deemed of the approximate value of $7,500,000.

3. H. Hackfeld & Company, Limited, was to transfer the 50,000 shares of American Factors, Limited, stock, received for its assets, to seven named trustees (all respondents herein), in exchange for trust certificates. The trust agreement, a copy of which was attached to the resolution, provided that the trustees were to be vested with the voting

power of the stock for the period of the war and three years thereafter.

4. The board of directors of H. Hackfeld & Company, Limited, were to sell the trust certificates at a fixed price of $150, with leave in the board to accept Liberty bonds at par up to eighty per cent of the aggregate price. (Thus $7,500,000 would be realized for the assets of H. Hackfeld & Company, Limited.)

5. H. Hackfeld & Company, Limited, to be then disincorporated and the net proceeds of the sale distributed to its stockholders. (This was done, the common stockholders receiving about $194 a share for their stock.)

6. The board of directors of H. Hackfeld & Company, Limited, were authorized to do everything necessary to carry the resolution into effect.

7. During the term of the trust, none but loyal citizens of the United States, approved by the trustees, could hold trust certificates, and no one person or corporation could hold more than 2,500 trust certificates. The trustees were specifically authorized to hold trust certificates on the same terms as other persons.

■ Appellants contend that certain of the stockholders voted for and approved the above resolution as the result of duress or undue influence exerted upon them directly or indirectly by some of the respondents. They offered evidence tending to show that this was the fact, but the trial court believed otherwise, and on conflicting evidence decided in favor of respondents on this issue. This finding is conclusive on this court. Appellants likewise contend that certain of the respondents as trustees for appellant stockholders concealed material facts as to value from the stockholders and were, therefore, guilty of constructive fraud. The trial court found otherwise, and this finding, being based on conflicting testimony, cannot be disturbed on appeal.

The necessary steps to be taken under the resolution of July 19, 1918, were immediately carried out. Subscriptions were received from August 5th to August 20th. Some 647 prospective subscribers, who were nearly all island people (which was in accordance with the Custodian's intent to permit island people to participate), oversubscribed the number of shares available to the extent of about eleven per cent. The only appellant to subscribe

was J. F. Humburg, and he subscribed only to 500 shares, although, because of his holdings in H. Hackfeld & Company, Limited, he could have subscribed to about 1300 shares.

The proceeds of this sale amounted to $4,650,000 in cash and $2,850,000 in par value Liberty bonds, a total of $7,500,000. This sum was distributed to the stockholders of H. Hackfeld & Company, Limited, in the course of the liquidation of that company. In the course of liquidation, a rather significant fact appears. Trent Trust Company, Limited, trustee in liquidation, found it necessary to interplead the holders of the common and preferred stock to determine their relative rights in the liquidation assets. Appellants Rodiek, J. F. and August Humburg, von Damn, Klebahn and Schultze joined in the petition of the holders of the common stock. In that petition, those appellants pleaded and relied on the stockholders' resolution of July 19, 1918, a year and a half after it was passed. From 1918 to 1924, various liquidation dividends were distributed by the trustee to each of the appellants, so that they received $194 per share for their H. Hackfeld & Company, Limited, common stock. Appellants at no time during this period protested, objected, or gave notice of any defect in the sale of the business and, in fact, accepted and relied on the sale.

As pointed out, *supra*, the resolution of July 19, 1918, had left to the trustees the determination of who could buy the trust certificates. The original plan suggested by the Custodian's office had provided that the Custodian should pass upon all allotments. The directors in drafting the resolution had changed this provision to permit the seven trustees (five of whom were the confidential advisers of the Custodian) to pass upon all subscriptions. In so doing, the directors purported to act upon a cable from the Custodian to Trent of May 4, 1918, which stated in part: "I leave approval of all prospective purchasers to you comma Sherman comma Atherton comma Cooke comma and Hemenway period. Where you disapprove and need my support cable me signed A. Mitchell Palmer."

Appellants rely on this change in the plan as evidence of the fraud and conspiracy charged against respondents. It appears to us immaterial whether this change in the plan was authorized by the Custodian by the

above cable, or whether the directors made the change on their own initiative. In the first place, the only one who could complain was the Custodian, and not only has he not complained, but, indirectly at least, he expressed his approval of the plan. In the second place, all the other stockholders, with full knowledge that this provision was in the plan, voted for the resolution of July 19, 1918, unanimously. Moreover, in the face of the findings as to the good faith of these respondents, and in the face of the findings negativing the contentions of fraud and conspiracy, and in the face of the finding that full value was received for the assets of H. Hackfeld & Company, Limited (all of which findings are amply supported by the record), it does not appear to us just how appellants were in any way injured by this change in the plan. It was appellants who determined to sell and who fixed the price and it was, therefore, immaterial to them who should pass upon the purchasers.

Among the subscriptions received was a joint subscription of twenty-three of the respondents, who applied for stock in the new company in blocks ranging from 100 shares to the maximum of 2,500 shares. The aggregate of this joint subscription was 27,000 shares. Each individual and corporate subscription in this group was conditioned upon the allotment of at least 25,000 shares to this group—25,000 shares being one-half the total number of shares available. The document which incorporates the twenty-three subscriptions is referred to in the record as the "joint subscription" or "group" or "syndicate subscription". However, the members of this group did not agree to pool their stock with respect to voting power, nor was any member restricted from selling his stock, either inside or outside the group. The purpose of the group subscription is clear. The members of this group wanted, if they were jointly to invest close to $4,000,000 in the new enterprise, to be sure that at least half of the stock of the new company should be held by those who would bring skill and experience in the sugar business to the new corporation. The appellants make much of this joint subscription, alleging that it conclusively proves the fraud and conspiracy, being the last step necessary for its consummation. To this contention there are several answers.

Everyone concerned, and this includes all appellants who voted for the resolution of July 19, 1918, must have known at that time of the proposed joint subscription. It was announced in the press early in July, and the names of its principal participants were advertised publicly to stimulate interest in the sale of American Factors, Limited. Certainly it is not true that the Alien Property Custodian did not know of the proposed joint subscription. He not only knew of, but approved it. Bradley Palmer testified that the Custodian knew and approved of the syndicate subscription and that the allotment of 25,000 shares to its members was exactly what he desired, because it insured to the new corporation and to the other 600-odd subscribers, stability, credit, leadership and skilled and experienced management.

In making the various allotments of shares, the trustees rejected some subscriptions on various grounds. After certain corrections were made, there still remained an oversubscription of 4,645 shares. The trustees thereupon cut the subscriptions of the syndicate to 25,000 shares, the minimum, and the remaining excess was cut from the larger subscriptions. J. F. Humburg was the only appellant to subscribe. He subscribed for only 500 shares, although he could have subscribed to 1300 shares. The trustees at first rejected his subscription, but after the Custodian intervened on his behalf, the trustees awarded him 200 shares. Later certain questions arose as to interest charges and Humburg executed two releases of all claims against certain respondents arising out of the entire transaction.

The above constitutes what we consider a fair summary of the facts, all of which find ample support in the record. The appellants in their complaint charged, and during the course of the trial attempted to prove, that the sale of the assets of H. Hackfeld & Company, Limited, to American Factors, Limited, for $7,500,000 was part of a gigantic conspiracy on the part of respondents to secure this lucrative business for themselves at a price far less than its actual value, which they allege to be $17,500,000. Grave charges of actual and constructive fraud were made against respondents, and evidence was offered to prove these charges. On the issue of constructive fraud, appel-

lants strenuously contend that many of the respondents were trustees for them and violated their trust. Particularly do appellants emphasize the point that those respondents who were directors of H. Hackfeld & Company, Limited, were trustees for the stockholders, and it is pointed out that they all, as members of the "syndicate", purchased some of the stock themselves. This, it is contended, of itself proves constructive fraud. We have grave doubts as to whether the respondent directors were in fact in the position of trustees in carrying out the provisions of the resolution of July 19, 1918. Of course, it is elementary that directors of a corporation in many ways are trustees for the stockholders, but, as we understand the law, directors are to be treated as trustees only when acting as such, and are not trustees in reference to every corporate act. It appears to us that in selling the assets of H. Hackfeld & Company, Limited, the directors were not acting as trustees for the stockholders, for the simple reason that they were not acting upon their own initiative or discretion, but were acting upon direct orders from the stockholders themselves, as shown by the resolution of July 19, 1918, which resolution was approved unanimously by the stockholders. The directors, at the request of the largest stockholder, the Alien Property Custodian, could and did suggest to the stockholders as a body the plan that had been worked out to sell the assets of the company. But, as directors, they could and did go no further. When they submitted the plan to the stockholders, and fairly disclosed all relevant facts appertaining thereto, as found by the trial court on conflicting evidence, and when the directors disclosed to the stockholders, as they did, that they and the respective companies of which they were officers, were going to subscribe and were, therefore, prospective purchasers, their duty as trustees was ended. It was the stockholders who determined to sell and fixed the price— not the directors. What possible difference could it make to the stockholders, after they fixed the price, who purchased at the sale? Particularly, by what process of reasoning can it be said that the stockholders were defrauded by having the directors purchase at the sale, when the stockholders, themselves, in the resolution of July 19, 1918, authorized the directors to buy? The argument falls of its own weight.

■ It would serve no useful purpose to take up each point raised by appellants in reference to their theory of fraud and conspiracy. As is usual in such cases, the trial court was presented with two diametrically opposed stories, two diametrically opposed theories, two different and opposed interpretations of certain acts and facts, and, on such conflicting evidence, the trial court decided in favor of respondents. Under such circumstances, our well-known rule as to findings based on conflicting evidence forbids interference with the judgment. What was said by this court in the case of *Brown* v. *Canadian Industrial Alcohol Co.*, 209 Cal. 596 [289 Pac. 613], in quoting from *Hotaling* v. *Hotaling*, 187 Cal. 695, at page 699 [203 Pac. 745], applies here: " 'The trial judge was called upon to delicately adjust the balance so as to determine upon which side, in the great mass of conflicting evidence and inference, the preponderence might be; while upon this appeal our only duty is to ascertain if there was any substantial showing in behalf of the court's finding to give rational support to the conclusion reached.' "

Due to its importance in this case, some mention should be made of the issue of value. Appellant's whole case depended basically on proving that the price paid was inadequate. Unless they could prove that $7,500,000 was not a fair and adequate price under the circumstances then existing for the assets of H. Hackfeld & Company, Limited, their charges of fraud and conspiracy became of only academic interest. Without such proof, they could show no damage, and this is admittedly an action for damages, not for rescission.

■ Before discussing this issue directly, some mention should be made of the Richard Cooke letter of May 1, 1918. Richard Cooke was vice-president of Trent Trust Company, Limited; vice-president of C. Brewer & Company, Limited; vice-president of H. Hackfeld & Company, Limited, after May 20, 1918; director and president of J. F. Hackfeld, Limited, after February, 1918; and was also one of the personal advisers of the Custodian. In May of 1918 the advisers were not aware that the Custodian definitely had made up his mind that his plan should, if possible, be adopted. The advisers, at that time, were still considering other possibilities. Under this state of facts,

on May 1, 1918, Cooke wrote a detailed letter to Trent in reference to a plan to liquidate H. Hackfeld & Company, Limited, to sell its assets piecemeal. This letter was "discovered" by appellants in the closing days of the trial, although the basic features of the Cooke plan were disclosed from the first days of the trial. Appellants contend that it conclusively shows concealment of pertinent facts both from the Custodian and from the other stockholders who are appellants herein, and that it likewise proves that the assets of H. Hackfeld & Company, Limited, were worth well over $11,000,000. It is admitted that this letter was not sent to the Custodian, nor was it disclosed to the other stockholders.

In this letter Cooke stated that "it appears to me that the net value of this concern is over $11,000,000 rather than being somewhere around $8,000,000, as had been roughly estimated". He then pointed out that, under the Custodian's plan, this sum could not be realized and suggested that $11,000,000 could possibly be realized by selling all the plantation stocks and agencies to the three respondent sugar factor companies; by selling the merchandising end of the business, its real estate, book accounts, etc., to a new corporation for $3,000,000; and distributing the balance of the assets by converting them into cash. After discussing the merits of his plan, as compared to that of the Custodian, Cooke analyzed the assets of H. Hackfeld & Company, Limited, indicating a total value of over $11,000,000.

It will be noted that Cooke's plan involved liquidation by a piecemeal sale of the assets of H. Hackfeld & Company, Limited. The basis of his plan, as shown by his financial setup, was to sell to the three respondent firms the plantation stocks held by Hackfeld for about $5,500,-000; that the agency contracts should be sold to these firms for $1,500,000; and that the same firms should largely finance the new merchandising corporation. The plan was obviously opposed to that of the Custodian, the latter desiring to preserve the business of H. Hackfeld & Company, Limited, intact, if possible. Cooke's plan was utterly dependent on the necessary fact that buyers must be secured who would buy at that price, and these buyers were to be the three respondent firms. The plan fell of

its own weight, because immediately the prospective buyers refused to buy. It is true that the letter was not sent to the Custodian, nor disclosed to the other stockholders, and it is likewise true that there is some correspondence between some of the respondents indicating a desire that the plan be not suggested, but this does not amount to the fraudulent concealment of a material fact. In the first place, if the plan had been suggested to the Custodian and to the other stockholders, it would also have been necessary to point out that, although it was undoubtedly a good plan, it could not be carried out because the proposed buyers would not buy at that price. In the second place, although Trent did not send the letter to the Custodian, he did send substantially the same figures submitted by Cooke. If the plan had been an offer to buy instead of being, in effect, an offer to sell, which was immediately rejected by the offeree, there would be some merit in reference to this contention. The ''concealment'' of this plan, under such circumstances, was of no importance.

Moreover, it must be remembered that most of the appellants were present in person or by proxy at the meeting of the stockholders on July 19, 1918. These men had all been intimately associated with H. Hackfeld & Company, Limited, for years. They were laboring under no misapprehensions as to the value of the business. The book value of the assets everyone knew was over $7,500,000, but also they all knew that a piecemeal sale of the assets would not bring that much, under conditions then existing. If they had not believed, any one of them could have forced such a liquidation by a refusal to approve the resolution, and everyone present knew this fact.

▮ On the issue of value, the evidence supports the finding that $7,500,000 was the largest sum that could have been realized for the assets of H. Hackfeld & Company, Limited, in August of 1918. It must be remembered that the fair value of the assets of the company in August of 1918 was the price those assets could be sold for as a unit in the open market, under the general conditions then prevailing. It seems rather futile to argue that buyers should have been willing to pay more, if in fact they would not do so.

In addition to a vast amount of expert testimony offered by respondents to sustain, and which in fact does sustain, their theory of value, the following factors all indicate that the price paid was adequate:

1. The value of all the assets of H. Hackfeld & Company, Limited, was fixed by the January reorganizers at about $7,000,000. At that time, 11,000 shares of common stock were sold at $180, which price, taking into consideration the lower value of the preferred stock, indicates the value above mentioned. Moreover, the proposed buyers, the Dillingham group, only agreed to pay this price after it was agreed that they, as the new directors, were to be allowed to share to the extent of one per cent in the profits. It was Humburg and Hagens who fixed this price, and they certainly were qualified to pass upon the value of the company. After April 11, 1918, the public generally knew that in January these two qualified gentlemen had placed this value on the common stock. It is apparent that after the public knew this fact, a price much higher would have been impractical. Appellants sought to discredit this value by various theories, even going to the extent of discrediting one of their own number—J. F. Humburg—on the theory that he was a member of the buying group, and that, therefore, his estimate was to be distrusted. The trial court chose to believe that Hagens and Humburg acted in good faith, and that the price of $180 a share was fair. If $180 was fair in January, certainly $194 a share was fair in July and August of the same year.

2. Another factor of great importance on the question of value is the fact that the stockholders, the actual owners of the property, put a value on the net assets of the company when they unanimously adopted the resolution of July 19, 1918. It is, of course, elementary that an owner of property is competent to estimate its value. This well-recognized rule is stated as follows in 10 California Jurisprudence, section 278, page 1923:

"It is a well-recognized rule that the owner of property, whether generally familiar with such values or not, is competent to estimate its worth, the lack of knowledge going to the weight rather than the admissibility of the testimony. And this applies alike to real and personal property."

The estimate placed upon the property in this particular case is of great importance, when it is considered that the estimate was made when each one of them knew that a negative vote of one share would have prevented the sale. This estimate was made by men who, by reason of their long and intimate association with the affairs of H. Hackfeld & Company, Limited, were far more cognizant of the real value of the assets of the company than were the directors, the alleged trustees. If there had been duress; if there had been a conspiracy; if the directors had been guilty of fraud; if the directors had concealed material facts from the stockholders, then the resolution of July 19th would have little weight as to value. But, as we have already seen, the trial court found that these things did not exist, and these findings are supported by the evidence. Since this is so, the valuation placed upon this property by these appellants in July of 1918 is entitled to great weight and almost seems to us conclusive of the question.

3. Under the provisions of the Trading with the Enemy Act, H. Hackfeld & Company, Limited, on January 5, 1918, submitted a report to the Custodian, as to the extent and value of enemy-held stock. This report, verified by J. F. Humburg, fixed the value of the common stock at $200 a share, which included a $25 accrued dividend. Thus, a value of $175 a share for the common stock was fixed by Humburg at a time when certainly there was no reason to underestimate its value. This estimate of value by one so intimately connected with the company is entitled to some weight on the issue.

4. On January 5, 1918, J. F. C. Hagens, acting chief executive of H. Hackfeld & Company, Limited, granted to E. G. Duisenberg an option to buy his 1,000 shares of common stock at $210 a share, which included the $25 accrued dividend, indicating a value of $185 a share.

All of the experts called by respondents were agreed that $7,500,000 was a fair price, under conditions then existing, for the assets of the company. All of them agreed that past earnings was the best indication and the controlling factor in determining the obtainable price. For the benefit of the trial court, respondents compiled records of the earnings of H. Hackfeld & Company, Limited, and the dividends it had paid over a ten-year period. The

annual average of earnings and dividends was computed for the entire ten-year period and for various groups of these ten years, some including and some excluding the abnormal years during the war. For each of the years involved there was computed the ratio of average annual earnings and dividends to the price of $7,500,000. Bankers, business men, dealers in stocks and bonds and financial experts all testified that in July and August of 1918, investments in established businesses were abundantly available on the basis of ratios of average earnings and dividends to price as high and some higher than those of H. Hackfeld & Company, Limited. This is of considerable importance, because the offer of the stockholders contained in the resolution of July 19, 1918, was an offer made in a competitive market. The price had to be as attractive as other investments then available, or obviously the buyers would not buy.

In leaving this phase of the case, this court feels, after reading the transcript and the long briefs, that we can do nothing but hold that when the late Judge Murasky wrote his rather laconic memo of January 6, 1926, in which he stated in part:

''I am of the opinion that:

''1. No actual fraud on the part of the respondents was shown;

''2. No constructive fraud existed;

''3. The price paid was adequate. . . . ''

that that able judge's determinations were amply supported by the record. Likewise, the findings of fact amplifying these three fundamental determinations are supported by the record, and, therefore, cannot be disturbed on appeal.

The only remaining point to be considered is in reference to the question of the validity of the seizures, raised by appellants in their supplemental brief, filed by permission of this court.

In this brief, the appellants present but one point, namely, that the stock of H. Hackfeld & Company, Limited, was illegally seized by the Custodian and illegally voted by him, through Trent, at the stockholders' meeting of July 19, 1918. As substantiating their contention, appellants strongly rely on the case of *Isenberg* v. *Trent Trust Co.* (the same company that is respondent herein),

26 Fed. (2d) 609, on rehearing 31 Fed. (2d) 553, *certiorari* denied 279 U. S. 862 [73 L. Ed. 1001, 49 Sup. Ct. Rep. 479].

Appellants very strenuously contend, upon the authority of the Trent Trust Company case, and other cases, that the Custodian was in unlawful possession of the stock, on the theory that there was neither a voluntary delivery to, nor a lawful seizure of the stock by him, and that, therefore, he unlawfully voted the same in July of 1918.

On the question of the validity of the seizures, the trial court found that the "Alien Property Custodian, in January and March, 1918, duly seized and acquired" the stock herein involved. Appellants attack this part of the finding on the theory that it is contrary to the evidence, and contend that if this finding is erroneous, the whole case of respondents must fall to the ground, inasmuch as respondents' whole case is built up on the theory that the seizures were legal. In this connection, it should be here pointed out that both sides agree that the sale of the assets of H. Hackfeld & Company, Limited, to American Factors, Limited, was not a sale of enemy owned property, but a private transaction under Hawaiian law. At most, all the Custodian seized was enemy owned or controlled stock—at no time did he seize the assets of the company. The seized stock he never sold. As a stockholder—as the majority stockholder he participated with the other stockholders in the sale of the assets to American Factors, Limited. This much is clear.

Assuming, for the moment, that the Custodian never legally seized the stock involved, we are not clear as to the results that would follow therefrom. If this were an action for rescission, instead of for damages, it would be apparent that if the seizures were invalid, the vote of the stock was not lawful, and the sale should be rescinded. But as we read the complaint, it *affirms the sale* and *asks for damages*. If no damages were in fact suffered, it is not apparent how the fact that the stock was unlawfully voted would entitle appellants to relief in an action for damages.

Respondents contend that this point, now raised by appellants, was not presented to the trial court, and that appellants are attempting to raise a new point and to

present a new theory on appeal. Respondents contend that at every stage of the case up to and including their opening brief, appellants admitted and affirmed the validity of the seizures. After reading the voluminous pleadings and the long transcript, we are of the opinion that the issue is properly before us on this appeal, although the point was not presented to the trial court as clearly as might be desired. Upon examination, it appears that several clauses of the complaint can be interpreted so as to put the title of the Custodian in issue, and certainly evidence was introduced in reference to his title. As already stated, the trial court made a direct finding on this issue. Another factor which has induced us to consider this point on its merits is the fact that the question presented can be determined entirely from documentary evidence, the authenticity of which is not in dispute. We turn then to a discussion of this point on its merits.

The Trading with the Enemy Act was passed on October 6, 1917 (U. S. Code, Ann. [Appendix], p. 189, 40 Stats. at Large, 411). Section 7 (a) of the act, among other things, required corporations to report to the Custodian enemy holdings of their stock. Under date of January 5, 1918, H. Hackfeld & Company, Limited, made a verified report to the Custodian on official form, A. P. C. No. 100, indicating the extent and value of the holdings of its several enemy stockholders. On the same date, J. F. Hackfeld, Limited, made its official verified report on A. P. C. Form No. 101. These reports were received by the Custodian in Washington on January 19, 1918. The record also indicates that before January 12, 1918, both Hackfeld companies had made informal reports to the Custodian concerning their enemy owned stock.

By a cablegram dated January 12, 1918, received on January 22, 1918, the Custodian appointed Trent Trust Company, Limited, his depositary in the islands, authorizing said company to "proceed to act as though qualified", and also authorizing said company "to collect informal sworn reports". The cable also ordered Trent Trust Company, Limited, as such depositary, to "take possession of (enemy owned) properties as depositary all cases except where in possession of other reputable banks, trust companies". On the day this telegram was received in Hono-

lulu, January 22, 1918, the Trent Trust Company, Limited, caused to be published in the local papers the fact of its appointment, a request for reports, and a request for delivery of enemy owned property. On January 23, 1918, Trent cabled the Custodian that out of a total capital stock of 40,000 shares in H. Hackfeld & Company, Limited, 14,391 shares were enemy owned. On January 25, 1918, the Custodian replied to this cable in part as follows: "You are hereby authorized and directed to have fourteen thousand three hundred and ninety-one shares transferred and issued in name of Alien Property Custodian and certificates deposited with Trent Trust depositary."

As pointed out, *supra,* when this cable was sent by the Custodian on January 25th, he had already received, on January 22d, the official report to H. Hackfeld & Company, Limited, showing the same total of enemy owned stock in that company.

It then appears, indirectly, that on January 26, 1918, Trent, in writing, requested H. Hackfeld & Company, Limited, to transfer all enemy owned shares to the Custodian in accordance with his orders.

On January 29, 1918, the minutes of the meeting show that the directors of H. Hackfeld & Company, Limited, held a special meeting to consider "the situation brought about by the request of the Trent Trust Company, Ltd., as depositary . . . for the delivery of 14,391 shares of the capital stock of the company, standing in the names of alien enemies". The minutes also show that it was moved, seconded and carried unanimously that the stock in question be delivered to the Trent Trust Company, Limited, "by transferring the same to the name of A. Mitchell Palmer, Alien Property Custodian, and delivering the respective certificates to the said Trent Trust Company, Ltd." The same minutes also recite that "after a lengthy deliberation, Mr. Dillingham moved that the president be authorized to take steps to comply with the request of the Trent Trust Company, Ltd., and that he so notify them. The motion, duly seconded by Mr. Wilcox, was carried unanimously".

On the same day, January 29, 1918, in accordance with the above resolution, 14,391 shares of enemy owned stock in H. Hackfeld & Company, Limited, were transferred on the books of the company, to the name of A. Mitchell Palmer, Alien Property Custodian, and the new certificates were

delivered to Trent Trust Company, Limited, as depositary for the Custodian. Some time in March of 1918, 333 more shares owned by J. R. Pflueger were transferred to the Custodian in like manner.

On January 31, February 1 and February 11, 1918, the Custodian in Washington, issued formal demands, directed to H. Hackfeld & Company, Limited, covering the enemy owned stock already issued in his name, and the certificates for which were already in the possession of Trent Trust Company, Limited. These demands were served on the corporation on February 27, March 11, and March 23, 1918.

These are the facts in reference to the seizures.

Before discussing appellants' contentions in reference to the invalidity of these seizures, it should be pointed out that it is a fact that every person whose stock was thus seized was an enemy within the meaning of the Trading with the Enemy Act. Stated in another way, every share thus seized was lawfully the subject of seizure under the terms of the Trading with the Enemy Act.

Appellants contend that under the provisions of the Trading with the Enemy Act, there were only two ways in which enemy owned stock could be transferred to the Alien Property Custodian—by a voluntary delivery, or by a lawful seizure, predicated on valid demands. Appellants contend that in this case there was neither a voluntary delivery nor a lawful seizure.

In order to understand the points made by appellants, it is necessary to refer to several provisions of the Trading with the Enemy Act, and to several executive orders promulgated thereunder.

Section 7 (d) of the Act provides in part: " . . . any person not an enemy or ally of enemy who owes to, or holds for, or on account of, or on behalf of or for the benefit of an enemy or of an ally of enemy not holding a license granted by the President hereunder, any money or other property, or to whom any obligation or form of liability to such enemy, or ally of enemy is presented for payment, may, at his option, with the consent of the President, pay, convey, transfer, assign, or deliver to the Alien Property Custodian said money or other property under such rules and regulations as the President shall prescribe."

The act specifically conferred upon the President the power to make orders, rules and regulations for the purpose

of carrying out the provisions of the act. (Sec. 5 [a].)
Under date of October 12, 1917, the President, acting pursuant to the power thus conferred, issued certain executive orders, which, among other things, provided for certain agencies to perform the duties required under the provisions of the Trading with the Enemy Act and established certain rules and regulations in respect to various matters covered by the act. By these orders, the executive administration of certain provisions of the act, including section 7 (d) *supra*, were vested in the Alien Property Custodian. Executive Rule XXX, promulgated above, provided as follows:

"Any person who desires to make conveyance, transfer, payment, assignment or delivery, under the provisions of section 7 (d) of the Trading With the Enemy Act, to the Alien Property Custodian of any money or other property owing to or held for, by or on account of, or on behalf of, or for the benefit of an enemy or ally of enemy, not holding a license granted as provided in the Trading with the Enemy Act, or to whom any obligation or form of liability to such enemy or ally of enemy is presented for payment, *shall file application with the Alien Property Custodian for consent and permit to so convey,* transfer, assign, deliver or pay such money or other property to him, and said Alien Property Custodian is hereby authorized to exercise the power and authority conferred upon the President by the provisions of said section 7 (d) to consent and to issue permit upon such terms and conditions as are not inconsistent with law, or to withhold or refuse the same."

Appellants contend that a voluntary delivery of enemy property could only be made to the Custodian, under the provisions of section 7 (d), *supra*, and Rule XXX, *supra*, by the person desirous of so delivering enemy property first filing an application with the Custodian for permission, and then securing a permit from the Custodian permitting the surrender. It is conceded that no such formal application was made in this case, and it is likewise conceded that no formal permit to surrender was issued by the Custodian.

Appellants next contend that no lawful seizure of the stock, predicated upon lawful demands, was ever made by the Custodian, for the reason that under the terms of the Trading with the Enemy Act, and the rules and regulations

promulgated thereunder, it was required before seizure that there must be (1) a determination of enemy status; (2) a demand for specific property; and (3) service of the demand on the person having possession of the property, and contend that none of these three elements existed here. Appellants point out that admittedly the shares of stock were transferred to the name of the Custodian, and the certificates delivered to the depositary on January 29, 1918, two days before demands were ever prepared, and almost a month before they were served on the corporation. Appellants likewise quote from and rely upon an executive order of February 26, 1918. (The day before the first demand was served on H. Hackfeld & Company, Limited.) The order provides in part:

"2 (a). The Alien Property Custodian may make demand for the conveyance, transfer, assignment, delivery, and payment of any money or other property owing or belonging to or held for, by, on account of, or on behalf of or for the benefit of an enemy not holding a license granted by me or in the exercise of my power and authority, which the Alien Property Custodian, after investigation, shall determine is so owing or so belongs or is so held, . . . "

"2 (c) When demand shall be made and notice thereof given, as hereinbefore provided, such demand and notice shall forthwith vest in the Alien Property Custodian such right, title, interest, and estate in and to and possession of the money or other property demanded and such power or authority thereover as may be included within the demand, and the Alien Property Custodian may thereupon proceed to administer such money and other property in accordance with the provisions of the 'Trading With the Enemy Act' and with any orders, rules, or regulations heretofore, hereby, or hereafter made by me or heretofore or hereafter made by the Alien Property Custodian."

Appellants cite many cases to the effect that the law is well settled that a determination of enemy status, demand for specific property, and service of the same upon the person in possession are necessary to constitute a valid symbolic seizure of enemy property. See for example, *Hunter* v. *Central Union Trust Co.*, 17 Fed. (2d) 174, 178, *Sutherland* v. *Guaranty Trust Co.*, 11 Fed. (2d) 696, 697, *Garvan* v. *Marconi Wireless Tel. Co.*, 275 Fed. 486, 488, on the question of the necessity of a determination of enemy status;

and *Hunter* v. *Central Union Trust Co., supra, Sutherland* v. *Guaranty Trust Co., supra, In re Miller,* 281 Fed. 764, 772, *Central Union Trust Co.* v. *Garvan,* 254 U. S. 555 [64 L. Ed. 403, 41 Sup. Ct. Rep. 214], *Miller* v. *Rouse,* 276 Fed. 715, on the questions of the requirement and necessity of a demand, and the person upon whom the demand must be made. The case upon which appellants place their greatest reliance, however, is the first decision in *Isenberg* v. *Trent Trust Co., supra.* The facts of that case, as set forth in 26 Fed. (2d) 609, are as follows:

In 1902, Otto Isenberg, a German, then resident in Hawaii, died, leaving surviving him a widow and nine children. By his will be created various trusts, vested in two trustees, by which two-thirds of his estate was to be delivered in equal shares to his children when they reached the age of twenty-five, and one-third of the estate was to be held by the trustees to pay the income thereof to his widow for life, remainder to the children. The estate was duly probated, *and passed to the trustees upon the closing of the probate in 1905.* Included within the estate were certain shares of the Kekaha Sugar Co. On the books of the company, this stock was in the names of the trustees.

In 1903, the widow and seven of the children removed to Germany and resided there during the war. Two sons, Hans and Carl, did not remove to Germany. These two were not enemies within the meaning of the Trading with the Enemy Act, being American citizens resident in Hawaii. Each of these two American citizens had a one-ninth interest, in remainder, in the trust estate in which their mother held a life estate.

In 1917, the two trustees of the trust were Schultze and Rodiek. In December of 1917, Schultze, who was a German citizen, resident in Hawaii, made an informal report to the Custodian of the property held in his hands for enemies. His cotrustee, Rodiek, did not join in that report, being then absent in San Francisco. In November of 1917, the Kekaha Sugar Company also made a report to the Custodian, listing *140* shares of Kekaha stock as standing on its books in the name of the *Estate of Otto Isenberg,* as enemy owned.

On January 29 and February 2, 1918, Schultze delivered to the Trent Trust Company, as depositary for the Custodian, all of the certificates in his hands within the terms of the

above trust. This included, of course, the shares in which Hans and Carl, American citizens, had an interest in remainder. On May 17, 1918, the Custodian issued a formal demand on the Kekaha Sugar Company declaring that the *Estate of Otto Isenberg* was enemy owned, and declaring that he, therefore, seized all of the *840* shares of Kekaha stock then on the company's books *in the name of the estate*. The Custodian also issued and *served eight demands on Schultze as trustee,* declaring that the widow and seven children were enemies, and seizing all of *their* right, title and interest in and to the *estate of Otto Isenberg*.

In July of 1918, Schultze petitioned for and in August was discharged as trustee. In October of 1918, the Trent Trust Company, in whose name the stock was then listed as *depositary for the Alien Property Custodian,* was appointed *trustee of the trust as successor to Schultze and Rodiek.* In January of 1919, the Custodian at public auction sold all of the Isenberg stock in the Kekaha Sugar Company held by him at $158 a share, Trent Trust Company, as trustee, making no objection to the sale of the undivided interest in remainder of the two American citizen beneficiaries.

In October of 1921, the Trent Trust Company filed a petition to settle its account as trustee. The children objected to the settlement of this account. The trial court held that there was no fraud or conspiracy, but held that 670 shares of Kekaha stock was a part of the trust estate and should have been in the trustee's possession; that said shares had been lost to the estate through the *trustee's failure to reduce them to possession* (by permitting the Custodian to sell them without objection) and that the Trent Trust Company *as trustee* was under an obligation to restore 670 shares of Kekaha stock to the estate, or in default to pay to the estate their value at the time of trial. The trial court entered a decree removing the Trent Trust Company as trustee, and adjudged that said company must pay to its successor as trustee some $287,000, with interest. The Supreme Court of the Territory of Hawaii partially reversed the case. The case was then appealed to the Circuit Court of Appeals, and that court in 26 Fed. (2d) 609 reversed the Hawaiian Supreme Court, and affirmed the decision of the trial court.

Among other things, the Circuit Court of Appeals in its first opinion (26 Fed. (2d) 609) held that the demands made on Schultze and the Kekaha Sugar Company were insuffi-

cient to constitute a valid symbolic seizure of the stock, for several reasons.

In the first place, the court pointed out that the demand served on the Kekaha Sugar Company was insufficient for the reason that it misdescribed the property. The demand read that the Custodian had determined that the "Estate of Otto Isenberg, whose address is Berlin, Germany, is an enemy and has a certain right, title and interest in and to 840 shares of common stock standing on your books in the name of Estate of Otto Isenberg." In reference to this demand, the court stated (p. 612):

"There was no estate of Otto Isenberg whose address was Berlin or elsewhere, and there were no shares standing on the books of the Kekaha Sugar Company in the name of the Estate Otto Isenberg. Otto Isenberg had died many years before. His estate had been administered and settled and closed, and his executors had been discharged in 1905, and in that year the property of the estate had been delivered to trustees, who held it for the benefit of Otto Isenberg's widow and children, and from and after that date the shares of the stock of the Kekaha Sugar Company stood in the names of the trustees."

It is obvious, therefore, that no valid demand was ever made on the Kekaha Sugar Company, not, however, because the demand was served after the corporation had transferred the stock to the Custodian, but because the demand failed utterly to describe any enemy owned property.

The court also held that the demands made upon Schultze were insufficient, and it is upon the language used in this regard that appellants chiefly rely. In reference to these demands, the court said (p. 612):

"At the time when those demands were made, the trustees held no property belonging either to themselves or to the beneficiaries of the trusts. The demands were made in June, 1918. At that time the appellee held, and since January 31, 1918, had held, possession of all the shares of stock belonging to the trustees or to the beneficiaries, and there was nothing in the hands of the trustees subject to their control or subject to seizure. On January 31, 1918, Schultze, trustee, had voluntarily surrendered all the trust estate to the appellee as depositary and on March 11, 1918, the shares of stock constituting the trust estate had been transferred to the appellee as depositary for the Alien Property Custodian.

Demand upon Schultze, after he had surrendered the *corpus* of the trust estate and had been divested of title thereto, cannot be said to be a seizure. No demands were addressed to the appellee. It has been uniformly held that no seizure can be had without a valid demand upon the party in possession of the property."

Appellants strenuously contend that the language so used, when applied to the facts of the instant case, makes the demands involved herein invalid, for the reason that at the time of their service on H. Hackfeld & Company, Limited, that company had already transferred the shares on its books to the name of the Custodian and delivered the certificates to the depositary, and, therefore, there was nothing upon which the demands could operate.

The court also held that the surrender of the stock by Schultze was not a "voluntary surrender" within the meaning of the Trading with the Enemy Act. On this point, the court stated (p. 612):

"We are of the opinion that the voluntary surrender by Schultze as trustee of the entire *corpus* and income of the Otto Isenberg estate was without authority of law. On January 31, 1918, there were two trustees, Schultze and Rodiek. Schultze alone made the surrender to the appellee of the shares which stood in the names of himself and his cotrustee, and on March 11, 1918, the appellee surrendered to the Kekaha Company the stock certificates and received in place thereof one certificate for 170 shares and one for 500 shares as requested by it, in its capacity as depositary for the Alien Property Custodian. This was done without authority from the Custodian. Up to that time there had been no determination that any of the beneficiaries of the Otto Isenberg trust estate were enemies, and no demand had been made for the surrender of their property."

It is appellants' contention that this language clearly shows that no voluntary surrender took place in the instant case.

The court next proceeded to point out that in October of 1918, without notice to the widow or beneficiaries, the Trent Trust Company on its own petition, was appointed trustee of the trust. "In thus assuming," said the court at page 613, "as it did, the duties of trustee of an active trust, while at the same time discharging the duties of representatives of the custodian of alien funds, the appellee acted in incon-

sistent and conflicting capacities. As trustee, it was the duty of the Trent Trust Company to protect the trust and carry out its provisions, and this the company did not do." The court then pointed out that the entire fund *was not enemy owned,* but that two of the beneficiaries "were not enemies, but were loyal American citizens, residing in the United States, and they held an interest in the shares of stock which had been set apart for the benefit of the widow during her life".

As an alternative ground of its decision, the court held that even if the demand on the Kekaha Sugar Company was valid, and even if there was a valid seizure of the stock, even then the Trent Trust Company would be liable as trustee, for the reason that the Custodian never seized the *corpus* of the trust fund. The Trent Trust Company was chargeable with notice of the nature and extent of the seizure. The demand was for the "right, title and interest" of the Estate of Otto Isenberg in and to certain shares of stock, and this did not include a seizure of the interest of the American citizen beneficiaries. At page 613, the court said: "Until the respective rights of the trustee and the beneficiaries were judicially determined, no rights in any particular portion of the *corpus* of the trust were confiscatable by the Custodian, for he was not vested with title to the *corpus,* or to any particular portion thereof, but, if vested at all, was vested only with the right, title, and interest of the beneficiaries, and in fact the right, title and interest of the beneficiaries was not sold. The sale was a specific sale of 500 shares of stock 'owned' by the widow and 170 shares of stock formerly 'owned' by Paul Otto Isenberg, and it was not a sale of shares belonging to a trust estate, for neither was the widow nor Paul Otto owner of any Kekaha shares."

The court then held that the Trent Trust Company had violated its duty *as trustee,* and was liable, therefore, to the beneficiaries for that reason. At page 613, the court said: "We think it was the plain duty of the appellee, as soon as it was appointed trustee of the Isenberg trusts, to initiate a proceeding under section 9 of the Trading with the Enemy Act (50 U. S. C. A. Appendix, sec. 9; Comp. Stats., sec. 3115½e), to recover the *corpus* of the estate. Section 9 of the act (50 U. S. C. A. Appendix, sec. 9; Comp. Stats., sec. 3115½e), as it then stood, provided that anyone not an enemy or ally of an enemy, claiming any interest, right, or

title in any money or other property so sequestered and held, might give notice of his claim and institute a suit in equity against the Custodian to abide the final decree. The commencement of such a suit would require the Alien Property Custodian to retain the property until determination of the rights thereto. In such a final decision undoubtedly the *corpus* of the trusts would have been protected and the interests of the American citizens involved would have been safeguarded, and opportunity would have been afforded to segregate such property as was subject to confiscation. (*Central Trust Co.* v. *Garvan*, 254 U. S. 554 [65 L. Ed. 403, 41 Sup. Ct. Rep. 214]; *Stoehr* v. *Wallace*, 225 U. S. 239 [65 L. Ed. 604, 41 Sup. Ct. Rep. 293].)''

In other words, part of the *corpus* of the estate was not enemy owned, and not subject to seizure. The Custodian should never have received the entire *corpus* of the estate, and when the entire trust estate was delivered to him, it was the trustee's duty to try and get it back. At page 615, the court sums up its opinion as follows: ''If it is true, as we hold, that neither Schultze's voluntary surrender nor the subsequent demands of the Custodian operated to vest in the Custodian the legal title to the 670 shares in dispute, the sale by the Custodian was wholly void. If, on the other hand, it is true that the surrender and the subsequent demands of the Custodian were sufficient to authorize the Custodian to deal with the property as held by enemies, the Custodian had the right to sell no more than the right, title, and interest of enemy beneficiaries in the estate. No such sale was had. The sale was of stock 'owned' by the widow and stock 'owned' by Paul Otto. This is shown by the correspondence and the advertisements of the sale, and the order which was sent by the Custodian to the appellee, in which the widow and Paul Otto were listed as enemies and as the owners, respectively, of 500 shares and 170 shares of Kekaha Sugar Company stock.''

The Circuit Court of Appeals subsequently granted a rehearing, solely to reconsider the question of damages. The decision on rehearing is to be found in 31 Fed. (2d) 553. In this opinion, the court interpreted its former opinion as follows (p. 554) : ''Speaking generally, the ground or basis of the decision adverse to the appellee was that it was its plain duty, upon its appointment as trustee of the Isenberg trusts, to institute proceedings under the Trading with the Enemy

Act (50 U. S. C. A. Appendix) for the recovery of the shares of stock here involved, and that its failure so to do resulted in the sale of the stock by the Alien Property Custodian, and its consequent loss to the *cestuis que trust.*"

It is obvious from this analysis, given by the same court that wrote the first opinion, that the court actually based its decision on the alternative grounds given in its first opinion. If that is so, the case has no application to the instant case.

Without attempting any fine distinctions, it is apparent to us that the above case differs in one fundamental respect from the case at bar. In the above case there was seized property not properly seizable—property belonging to American citizens, residing in American territory. In the instant case, the trial court found, and such finding is amply supported by the record, that every person whose stock in either Hackfeld Company was seized by the Custodian, was an enemy within the meaning of the Trading with the Enemy Act. Every share seized was therefore lawfully the subject of seizure. In the case at bar, the Custodian got only that which he was lawfully entitled to.

In considering the facts of the instant case, and the law applicable thereto, we are of the opinion that the Custodian lawfully seized the shares of stock involved herein. It is true, as urged by appellants, that before a seizure could lawfully take place, it was necessary that the Custodian determine, after investigation, that the property was enemy owned, but we are of the opinion that there was a compliance with this provision of the statute. The record shows that on January 5, 1918, H. Hackfeld & Company, Limited, submitted to the custodian an official report of its enemy holdings, as did J. F. Hackfeld, Limited. These official reports were received in Washington on January 19, 1918. On January 25, 1918, the Custodian, who was then in possession of the official report of H. Hackfeld & Company, Limited, which report indicated an enemy holding to the extent of 14,391 shares, telegraphed to Trent, authorizing and directing him to have that number of shares transferred to the Custodian's name as enemy owned property. These facts conclusively show a valid determination of enemy owned status within the meaning of the Trading with the Enemy Act. In *Garvan* v. *Commercial Trust Co.*, 275 Fed. 841, it was contended that the Custodian had not made a proper

determination of enemy status. The court stated at page 845: "In the instant case the Trust Company's report to the Custodian showed that Mrs von Schierholz was a resident of enemy territory, and that under the trust agreement she had a right to demand of the trust company that the moneys and securities in question be turned over to her. *On that report alone the Custodian could justly determine that the properties were held for an enemy.* Having so determined, his right to secure them cannot be resisted or questioned by the trust company. This conclusion renders it unnecessary to consider any of the other grounds stated in the answer or briefs."

The case was appealed, and the Circuit Court of Appeals for the Third Circuit, in affirming the decision, stated (281 Fed. 804, at p. 806): "We find no irregular or insufficient action on the part of the Alien Property Custodian in the demand, investigation and determination prescribed by the act."

The case was affirmed by the United States Supreme Court in 262 U. S. 51 [67 L. Ed. 858, 43 Sup. Ct. Rep. 486].

In *Great Northern Ry. Co.* v. *Sutherland,* 273 U. S. 182 [71 L. Ed. 596, 47 Sup. Ct. Rep. 315], the United States Supreme Court, in passing on the sufficiency of the demand there involved, stated (p. 188): "*The demand must be read in the light of the then existing legislation,* of its formal title or designation, of the extracts of the Executive Order embodied in it, *and of the reports of the Great Northern out of which it originated. And these reports must be read in the light of the fact that stock is presumed to be owned by the registered owner* and that, where stock is stated to be held by the registered owner for another named person, the latter is presumed to own the whole beneficial interest."

It is, therefore, our opinion that the requirement that there be a determination of enemy status was fully met by the Custodian, and that the seizures are not subject to attack on that ground.

The next contentions of appellants proceed upon the theory that the only way stock could be seized, after there had been a valid determination of enemy status, was by proper demands. Based upon this hypothesis, appellants argue that the demands in this case were not proper because they did not describe specific property, and because

they were not served on the proper party. Both of these contentions are, in our opinion, erroneous, but before discussing them we think it well to state that appellants have thus proceeded upon an incorrect interpretation of the Trading with the Enemy Act. We do not believe that a "proper demand" was a condition precedent in all cases to a valid seizure of intangibles, under the provisions of the act. In our opinion, the act does not prescribe the mode of seizure. (*Garvan* v. *Marconi Wireless Tel. Co.,* 275 Fed. 486.) As we read the act, it provided but one condition precedent to a valid seizure, namely, an executive determination of enemy status, which we have already held, existed in this case. It must be remembered that the Trading with the Enemy Act was an emergency war measure. In *Commercial Trust Co.* v. *Miller,* 262 U. S. 51, at page 53 [67 L. Ed. 858, 43 Sup. Ct. Rep. 486], the Supreme Court stated that the act "was an exercise of governmental power in the emergency of war and its procedure is accommodated to and made adequate to its purpose". In *Lizrodt* v. *Miller,* 17 Fed. (2d) 533, it was stated that "The purpose of the act was to reduce to possession all accessible enemy property, not only to cripple Germany, but to prosecute the war". As we read the act, it seems obvious that its primary purpose was to place enemy owned or controlled property in the hands of the Custodian. The service of a proper demand was one way to accomplish this result, the demand acting as a symbolic seizure. Such a symbolic seizure, however, was not the only way in which the Custodian could get possession. The purpose of any seizure—whether actual or symbolic—was to get possession. Primarily seizure means the taking of physical possession. As was said in *Miller* v. *Rouse,* 276 Fed. 715, at 717, "Normally, capture is seizure, and seizure is an act of forcible taking." There is a material difference between an actual taking, which existed here, and a symbolic taking accomplished by a demand.

The act itself recognized, in addition to a symbolic taking or capture, predicated on a proper demand, that a taking could be accomplished by a physical seizure—by force and arms, if necessary. "And it (the power of the Custodian) may be exercised by forcible seizure of the property or by suit." (*Commercial Trust Co.* v. *Miller, supra.*) "The statute creating the Custodian enables him to capture enemy

property with a sergeant and file, or otherwise *vi et armis.* He may also file a libel of possession, or he may sue in other ways . . . He can use his own method of procedure . . . '' (Concurring opinion in *American Ex. Nat. Bank* v. *Garvan,* 273 Fed. 43, at p. 48.) It is obvious, therefore, that if the Custodian, in this case, had forcibly taken possession of the property involved, he unquestionably would have acquired good title to it. Certainly the peaceful taking shown by the record herein should be no less effective.

Whatever rights the Custodian had in seized property originated in and were dependent upon possession—possession gained by means of an actual or symbolic seizure. Once the property was seized, the Custodian exercised rights of absolute ownership over it. (*Commercial Trust Co.* v. *Miller, supra; Munich Reinsurance Co.* v. *First Reinsurance Co.,* 300 Fed. 345, 6 Fed. (2d) 742, 751; *Junkers* v. *Chemical Foundation, Inc.,* 287 Fed. 597.)

Every case cited by appellants is distinguishable from the case at bar on the fundamental ground that in the cases cited, including *Isenberg* v. *Trent Co., supra,* the Custodian seized property to which he was not legally entitled, while, in the instant case, every share seized was enemy owned and properly the subject of seizure. The purpose of the various procedures open to the Custodian was to achieve a seizure or its equivalent. In this case, the Custodian attained his end peaceably, instead of by force, as he could have. He got possession, to which he was legally entitled, and, therefore, defects in demands, if they did exist, are immaterial, since demands are only symbolic of what actually took place here, namely, physical seizure. Once it is shown that there was a valid determination of enemy status, and that the Custodian got possession of only that to which he was entitled, defects in formal demands are of no importance. It follows that in so far as appellants' argument proceeds upon the theory that the demands were insufficient because they did not describe specific property and because they were not properly served, it is without merit. The legal sufficiency of the demands, in our opinion, is not an issue in this case.

 Assuming, however, that the sufficiency of the demands is involved on this appeal, we are of the opinion that the demands involved herein were legal and proper in all

respects. As stated above, appellants attack their sufficiency on the ground that they do not describe specific property and were not served on the person then holding the property. We are not able to follow appellants' contention that the demands served on H. Hackfeld & Company, Limited, were not sufficiently specific. The demands were as specific as demands could possibly be. For example, the demand for the stock of Julie Barckhausen (and the others were in substantially the same form), as prepared by the Custodian on January 31, 1918, and served on H. Hackfeld & Company, Limited, on February 27, 1918, provided in part:

"I, Mitchell Palmer, Alien Property Custodian . . . acting under the provisions of . . . the 'Trading With the Enemy Act', . . . and the executive orders issued in pursuance thereof . . . after investigation to determine that the following property, to-wit: . . . H. Hackfeld & Co., Ltd., common stock 1238 shares . . . is by you owing and belonging to and held for, by, on account of, and in behalf of, and for the benefit of Mrs. Julie Barckhausen
"Address: Braunschweig, Germany
"whom after investigation I do determine to be an enemy . . . and I hereby require that the said money and property shall be by you conveyed, transferred, assigned, delivered, and paid over to me as Alien Property Custodian . . . "

We can find no ambiguity or uncertainty in this demand. Of course, the certificate number of the shares is not given, but, in our opinion, that was not required. Even if it were required, that uncertainty was cleared up by the formal reports submitted by H. Hackfeld & Company, Limited, to the Custodian on January 5, 1918, in which the corporation named and described the holdings of its enemy stockholders. In reference to the Barckhausen holdings, the report contains the following description:

"H. Hackfeld & Co., Ltd., common stock in the name of Julie Barckhausen, Par Value $100,—1238 shares, Cert. #234, located in Honolulu, Market Value. Estimated $247,-600.00."

Under the authorities cited *supra*, these reports must be read with the demands, and, so read, the description is obviously as specific as could be desired.

The next contention of appellants is that the demands were invalid for the reason that they were issued and served on H. Hackfeld & Company, Limited, after the corporation

had transferred the stock on its books into the name of the Custodian, and had delivered the certificates into the possession of the depositary, Trent Trust Company, Limited. It will be remembered that H. Hackfeld & Company, Limited, had transferred the stock to the Custodian on January 29, 1918; that the demands were prepared in Washington on January 31, 1918, and first served on the corporation February 27, 1918. Appellant strongly relies on the language quoted from *Isenberg* v. *Trent Trust Co., supra,* where the court held that the demands served on Schultze, *the trustee,* were invalid because at the time of their service Schultze had already delivered the certificates to Trent Trust Company, and, therefore, had nothing to deliver when the demands were served upon him. Appellant contends that the principle there enunciated applies to the demands in this case, because when served *on the corporation issuing* the stock, that corporation had nothing to deliver having already transferred the stock to the Custodian. This is the real crux of appellants' argument in reference to the validity of the seizures. Appellants' idea seems to be that service of the demands should have been made on Trent Trust Company, Limited, because that corporation, as depositary, *was in possession of the certificates,* at the time service was made on H. Hackfeld & Company, Limited.

Appellants' argument in this regard is not sustainable on principle, nor is it sustained by the authorities cited to uphold it. It is not sustainable on principle, for the reason that it was clearly the rule under the cases interpreting the Trading with the Enemy Act that under no circumstances need a demand be served on the person or corporation holding the certificate of stock. The Custodian could properly make his demands for enemy owned stock directly upon the corporation issuing the same, regardless of who owned or held the certificate. This was clearly illustrated by the case of *Miller* v. *Kaliwerke, etc.,* 283 Fed. 746. In that case the *certificates* had been seized by the British Public Trustee under the provisions of the British Trading with the Enemy Act. Later the Alien Property Custodian of the United States attempted to effectuate a seizure by a demand served on the corporation issuing the stock at its domicile in New York. The court held that the demand served on the corporation issuing the stock consti-

tuted a valid seizure, regardless of the situs of or what happened to the certificates. At page 755, the court said: "Assuming, as we must, that the act gave the Custodian the power to seize the stock, it becomes important to inquire whether the method adopted to effect the seizure was a valid and effective one . . . In the proceedings under review the demand, and therefore the seizure of the stock, having been made within the southern district of New York, which was the domicile of the corporation as well as the domicile of the voting trustees, was an effective seizure of the stock, and it is quite immaterial, so far as the mere fact of seizure is concerned, whether the certificates were or were not in the possession of the British Public Trustee." See, also, *Great Northern Ry. Co.* v. *Sutherland,* 273 U. S. 182 [71 L. Ed. 596, 47 Sup. Ct. Rep. 315]. It is, therefore, clear that the Custodian acquired title to enemy owned shares by a demand served on the corporation, regardless of the whereabouts of the certificate. If the demand identified the stock title passed (*Schrijver* v. *Sutherland,* 57 App. D. C. 214, 19 Fed. (2d) 688, 690; *Baltimore etc. Ry. Co.* v. *Sutherland,* 18 Fed. (2d) 560; *Columbia Brewery Co.* v. *Miller,* 281 Fed. 289; *Garvan* v. *Marconi Wireless Tel. Co.,* 275 Fed. 486, 488.) It, therefore, follows that it was not necessary to serve the demand on the Trent Trust Company, Limited, for that company was the mere depositary of the certificates. When the first demands were served on H. Hackfeld & Company, Limited, on the books of that company, the Alien Property Custodian was the stockholder. Appellants have to concede that the demands would have been valid, if they had been served before the stock had been transferred to the name of the Custodian on the books of H. Hackfeld & Company, but they argue that the demands were void because served after the transfer. Inasmuch as a demand served on Trent Trust Company, Limited would have been ineffectual, under the authorities cited *supra,* that company being only the depositary of the *certificates,* appellants' argument in this regard can be reduced to the contention that the Custodian should have served H. Hackfeld & Company, Limited, and should have informed them that they must transfer to his name stock that had already been transferred, or that he should have served himself with a demand. Neither contention is reasonable.

In another important respect appellants' contentions in this regard are without merit. The demands served on H. Hackfeld & Company, Limited, were for the interests of certain named stockholders who were declared to be enemies. The demands were served on the corporation issuing the stock. The relation of that corporation to its own stock was precisely the same after the transfer to the Custodian as it was before the transfer was made. No change in stockholders could change the corporation's relation to the stock itself, nor could it change the effectiveness of a demand served on the corporation issuing the stock, for that stock. If H. Hackfeld & Company, Limited, had nothing to deliver on February 27th, when the demands were served upon it, it was only because the prior transfer was valid, so that the Custodian already had title to the stock. If the title to the stock did not pass to the Custodian by the transfers of January 29, 1918, then title to such stock on February 27, 1918, when the demands were served, must have still been in the enemy stockholders. If this is so, obviously the demands so served were valid and constituted a legal symbolic seizure. On principle, therefore, appellants' contentions are not sound.

Nor do the authorities cited by appellants assist them in this regard. The case principally relied upon is the first decision in *Trent Trust Co., Limited, supra.* As already pointed out, that case, and all other cases cited by appellants, are distinguishable fundamentally from the instant case because in that case the Custodian seized property not properly the subject of seizure, while in the case at bar, every share seized by the Custodian was enemy owned, and lawfully subject to seizure.

It is true that the court in the Trent Trust Company case, in its first decision, did hold that the demands served on Schultze, the trustee, were invalid, for the reason that the demands were served after he had parted with the property, but the language so used has no application to a situation where the demand is served on the corporation issuing the stock. Of course, after Schultze had surrendered the certificates and ordered the stock transferred out of his name into that of the Custodian, a demand on him was of no legal effect. It was in reference to the demand served on Schultze that the court stated (26 Fed. (2d), at p. 612):

"At that time, when those demands were made, the trustees held no property belonging either to themselves or to the beneficiaries of the trust . . . It has been uniformly held that no seizure can be had without a valid demand upon the party in possession of the property."

That language has no application here, for in the case at bar the demands were served on the corporation issuing the stock, not on a trustee stockholder. A demand on a trustee who holds legal title to stock for the benefit of enemy *cestuis* is not at all the same as a demand served on the corporation issuing the stock. Obviously, after the trustee has transferred the stock from his name and delivered the certificates, he has nothing left upon which the demand can operate. But, as we have already seen, the corporation issuing the stock bears the same relation to its own stock, regardless of who is stockholder. A demand on the corporation issuing the stock is valid, regardless of who is the stockholder, or regardless of the whereabouts of the certificate, providing there is a prior determination of enemy status, and providing the demand properly identifies the stock, and both of those requirements existed here. So interpreted, there is nothing in the first decision in the Trent Trust Company case, *supra*, inconsistent with what has been said herein, and we are of the opinion that the seizures involved herein were legal and valid in all respects. Our interpretation of the provisions of the Trading with the Enemy Act is, we think, in accord with the principle that that act should be liberally construed to give effect to the purpose it was enacted to subserve (*United States* v. *Chemical Foundation, Inc.*, 272 U. S. 1 [71 L. Ed. 131, 47 Sup. Ct. Rep. 1]; *Commercial Trust Co.* v. *Miller*, 262 U. S. 51 [67 L. Ed. 858, 43 Sup. Ct. Rep. 486]).

Appellants also contend that the demands involved herein are invalid because they were not signed by the Custodian personally, but were signed by "A. Mitchell Palmer, Alien Property Custodian, by J. Lionberger Davis, Managing Director." Appellants contend that the Custodian had no power to delegate his powers, until an executive order of February 26, 1918, conferred that power upon him. It is true that the executive order mentioned was the first express recognition of the existence of such a power, but it is obvious that such an implied power existed from the mo-

ment of the creation of the office of Alien Property Custodian—otherwise the Custodian would have been powerless. It is inconceivable that such an officer should not have the power to distribute his duties among his subordinates. The point is without merit.

We have thus considered the question in reference to the validity of the seizures at some length, and conclude that the seizures were legal, proper and valid, and that all the points raised by appellants in this regard are without merit.

For the foregoing reasons, the judgment appealed from should be and is hereby affirmed.

Mr. Justice Preston, being disqualified, does not participate herein.

A petition for a rehearing was denied on May 28, 1931, and the following opinion then rendered thereon.

THE COURT.—In considering the petition for rehearing herein, we find that the opinion heretofore filed by this court correctly and adequately disposes of the first three points made by petitioners. Each of the points raised by petitioners in this regard was decided by the trial court adversely to petitioners, on conflicting evidence. Under such a state of facts, our well-settled rules concerning findings based on conflicting evidence preclude this court from interfering with the judgment.

In reference to the last point urged by petitioners, it is true that the opinion heretofore filed failed to consider the matter discussed therein.

As we understand petitioners' position, it is contended that 185 shares of the common stock of H. Hackfeld & Company, Limited, belonging to one J. C. Pflueger, were never validly or lawfully seized by the Alien Property Custodian. Based on this major premise, it is, therefore, contended that inasmuch as it was admittedly the Hawaian law that a unanimous vote of all the stockholders was required to sell the assets of a solvent corporation, the resolution of July 19, 1918, must be deemed a nullity, for the reason that at that time Trent, as the representative of the Custodian, voted the 185 shares alleged to belong to Pflueger, when, as a matter of fact, these shares were never seized by the Custodian and still belonged to Pflueger.

A discussion of this point was intentionally omitted from the opinion for the reason that we then felt, and still feel, that it was not properly before us for consideration on its merits. The point cannot be considered on this appeal for the reason that it was never made in or presented to the trial court. The only point raised in the trial court in reference to the validity of the seizures was that all of the H. Hackfeld & Company, Limited, stock seized by the Custodian had been illegally seized, because of the alleged invalidity of the demands. This point was fully and adequately discussed in the opinion, and, for the purposes of this petition, is admitted to have been decided correctly. Even this point, far from being, as petitioners urge, the "essential feature" of their case, was only incidentally and incompletely presented to the trial court. It was only by a very liberal construction of the rule prohibiting the presentation of a new point or a new theory on appeal that we were able to consider the point in reference to the validity of the seizures at all. In reference to the stock of J. C. Pflueger, the entire 1246 shares of common stock owned by him were, at all stages of the trial, treated as a unit. Thus all 1246 shares were included in the allegations of the complaint concerning the seizures. When Pflueger was called as a witness, both counsel treated all of Pflueger's stock as a unit, the attorneys stipulating that all of his stock had been seized because of the fact that he was a resident of enemy territory. When Pflueger returned to this country after the war and demanded his property from the Custodian, he treated his common stock in H. Hackfeld & Company, Limited, as a unit. These, and many other facts appearing in the record, conclusively indicate that, during the trial of this case, at no time was there urged the point that these particular 185 shares were illegally seized for the reasons now sought to be urged. Under well-settled principles of law we are bound to hold that this point cannot now be considered.